*Ex parte* MORGAN.

(*District Court, W. D. Arkansas.* October, 1883.)

1. FUGITIVES FROM JUSTICE—POWERS OF GOVERNOR OF STATE—REQUISITION—PUBLIC POLICY.
    The chief executive of a state cannot issue a warrant of extradition for the arrest of a fugitive from justice on the ground of public policy. His only power to extradite a person from his state must be found in the constitution and laws of the United States.
2. SAME—POWER, WHENCE DERIVED.
    The manner of the exercise of this power is derived exclusively from the constitution and laws of the United States.

3. SAME—COMITY.

No such power can be exercised by the chief executive of a state on the ground of comity.

4. SAME—REASON FOR CREATION OF A POWER.

The reasons for the creation of a power are not the power.

5. SAME—HABEAS CORPUS—JURISDICTION OF CIRCUIT COURT.

Because it is alleged in the petition for the writ that Morgan is restrained of his liberty, contrary to the constitution and laws of the United States, there can be no doubt of the right of this court, by *habeas corpus*, to inquire into the legality of his arrest.

6. SAME—QUESTION FOR COURT TO DECIDE.

The state of the case at the time the governor issued the warrant for the arrest of Morgan, as shown by the record before him, is what is to be passed on by this court.

7. SAME—PROVISIONS OF CONSTITUTION AND ACT OF CONGRESS—SUPREME LAW OF THE LAND.

The provisions of the constitution on the subject of interstate extradition, together with the act of congress on the subject, are a part of the supreme law of the land, and therefore a part of the law of each state.

8. SAME—POWER OF GOVERNOR OF TERRITORY.

Under the constitution and law of congress the governor or chief executive of a territory, as well as the governor of a state, has a right to make a demand, upon the governor or chief executive of another state or territory, for the extradition of a fugitive from the justice of the demandant state.

9. SAME—PROVISION OF ACT OF CONGRESS BINDING ON GOVERNOR OF STATE.

That part of the law of congress providing that demand can be made by the governor of a territory, is binding on the governors of states and to be observed by them.

10. SAME—"STATE"—"TERRITORY."

The words "state" and "territory" have a definite, fixed, certain, legal meaning in this country and under our form of government.

11. SAME—DEFINITION OF "STATE."

A state means one of the commonwealths or political bodies of the American Union, and which, under the constitution, stand in certain specified relations to the national government, and are invested, as commonwealths, with full power in their several spheres over all matters not expressly inhibited.

12. SAME—DEFINITION OF "TERRITORY."

A territory, under the constitution and laws of the United States, is an inchoate state,—a portion of the country not included within the limits of any state and not yet admitted as a state into the Union, but organized under the laws of congress, with a separate legislature, under a territorial governor and other officers appointed by the president and senate of the United States.

13. SAME—CHEROKEE NATION NEITHER STATE NOR TERRITORY.

The Cherokee Nation is neither a state nor territory; it has an autonomy, but it does not come within the meaning of either a state or territory, but is a part of what is called "Indian country."

14. SAME—TRIBES—NATIONS.

The several tribes or nations belong to the republic, though they are neither a state nor territory.

15. SAME—DEMAND OF CHIEF FOR FUGITIVE FROM JUSTICE.

The Cherokee Nation being neither a state nor territory, the constitution of the United States and the laws of congress did not authorize the governor of the state of Arkansas to honor the demand of the chief of the Cherokee Nation for the extradition of Morgan.

16. SAME—REQUISITION—CERTIFICATE OF GOVERNOR.

By act of congress the affidavit or indictment upon which a requisition is based must be certified by the governor or chief executive as authentic.

17. SAME—LAWS IN RESTRAINT OF LIBERTY—CONSTRUCTION.

All laws in restraint of liberty are to be strictly construed and strictly pursued.

18. SAME—AFFIDAVIT—CERTAINTY.
    The affidavit, when this form of evidence is adopted, must be so explicit and certain that if it were laid before a magistrate it would justify him in committing the accused to answer the charge.

19. SAME—AUTHENTICATED COPY OF INDICTMENT—AFFIDAVIT.
    The representations of the executive of the demanding state are of no effect unless supported by a duly-authenticated copy of an indictment found or an affidavit made.

20. SAME—STRICT COMPLIANCE WITH ACT OF CONGRESS.
    The act of congress provides for a method that is summary in its effect, and must therefore be strictly complied with.

21. SAME—AFFIDAVIT ON BELIEF OR INFORMATION—SUFFICIENCY.
    The affidavit must be certain and absolute, and it is not sufficient if founded on belief or information.

22. SAME—"CHARGED WITH CRIME."
    "Charged with crime," in legal parlance, means charged in the regular course of judicial proceedings.


Proceedings in *Habeas Corpus:*

In this case the petitioner, Frank Morgan, files his petition for a writ of *habeas corpus,* in which, among other things, he states that by virtue of a requisition issued by the principal chief of the Cherokee Nation upon the governor of the state of Arkansas, the said governor did, on the eighteenth day of August, 1883, issue his warrant, directed to the sheriff of Sebastian county, state of Arkansas, for the arrest of the petitioner for the crime of murder by having killed one Albert Johnson; that on the eleventh day of September, 1883, the said sheriff, by virtue of the said warrant, arrested the petitioner, and now has him in custody for the purpose of delivering him into the custody of the authorities of the Cherokee Nation; that the said requisition so made by the chief of said nation was issued without any authority of law or treaty stipulations between the United States and the said nation; that the warrant of arrest issued by the governor of the state was issued without authority of law; that the said petitioner is now restrained of his liberty by the said sheriff in violation of the constitution and laws of the United States. For these reasons he prays a discharge from arrest. To this writ the sheriff returns that he holds the said Frank Morgan in custody by virtue of a warrant of arrest issued by the governor of the state of Arkansas upon a requisition of the principal chief of the Cherokee Nation, which said warrant so issued by the governor of the state of Arkansas, together with duly-certified copies of the requisition of the principal chief of the Cherokee Nation, and with demand and warrant accompanying the same, upon which said warrant was issued, are attached to his return. To this return the petitioner files a demurrer and answer. In his demurrer he sets up that the response of the sheriff and accompanying documents do not show facts sufficient to authorize the custody and imprisonment of the petitioner.

*Brizzolara, Marcum & Tiller* and *Taliaferro & Tabor,* for petitioner.
*Grace & Duncan,* for the Cherokee Nation.

PARKER, J. The demurrer to the sheriff's return, from the nature of that return, raises all the questions affecting the legality under the constitution and laws of the United States of the imprisonment of Morgan. I have no concern with the morality or public policy of this case. From the state of the case, I am called on to consider it from a purely legal stand-point, and to view it as a naked, simple legal question. It is true that, in the construction of a law, where there is doubt as to the purpose to bo subserved by the law-maker, we may take into consideration an existing condition of affairs, and the demands of public policy as to such affairs. But, in a case of this kind, the chief executive of a state cannot act on grounds of public policy. His power, and his only power, under the law as it now stands, to extradite a person from his state, must be found in the constitution and laws of the United States. If it is not there, it does not exist. Not only the power, but the manner of its exercise, is based exclusively on the constitution of the United States, and the law of congress passed in pursuance thereof.

Interstate extradition is regulated by law. No such power can ever be exercised by the chief executive of a state on the ground of comity. Rorer, Interstate Law, 225. Nor has it ever been, in this country, properly and legally exercised on such ground. Comity may and does afford a strong reason for the enactment of laws providing for the extradition of criminals, that they may be brought to justice, and society be thus protected. But we must look to the law for the right to exercise this extraordinary power. Even before our present form of government came into existence we find a number of the colonial plantations entering into a *compact* in the nature of a treaty for the extradition of fugitive criminals. If it could be done upon comity alone why enter into a compact. As early as 1643 the plantations under the government of Massachusetts, the plantations under the government of New Plymouth, the plantations under the government of Connecticut and the government of New Haven, and the plantations in combination therewith, pledged themselves to each other to render to the colony from which he escaped, the fugitive from justice, and they prescribed the means to be employed in such rendition. *Kentucky* v. *Dennison*, 24 How. 66; Winthrop's Hist. Mass. 121, 126. A similar compact was entered into by the American colonies when they organized themselves under the articles of confederation and assumed the title of "The United States of America." The fourth of these articles provided that if "any person, guilty or charged with treason, felony, or other high misdemeanor in any state, shall flee from justice and bo found in any of the United States, he shall, upon demand of the governor or executive power of the state from which he fled, be delivered up and removed to the state having jurisdiction of his offense." This article of the confederation was one of the principles of the "firm league of friendship and perpetual union" that the then acting as sovereign and independent states established. The

reasons of the creation of this power were public policy and public peace and public justice. But the reasons for the creation of a power are not the power, but they can only be used as a means of ascertaining what the created power is. The power under the articles of confederation is to be found in the fourth of these articles. The same power was incorporated into the constitution of the United States. The second section of the fourth article is as follows:

"A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up to be removed to the state having jurisdiction of the crime."

On the twelfth of February, 1793, congress passed an act respecting fugitives from justice, and persons escaping from the service of their masters. The first section of this act is substantially reproduced in section 5278 of the Revised Statutes of the United States, and is as follows:

"Whenever the executive authority of any *state* or *territory* demands any person, as a fugitive from justice, of the executive authority of any state or territory to which such person has fled, and produces a copy of an indictment found, or an affidavit made before a magistrate of any state or territory, charging the person demanded with having committed treason, felony, or other crime, *certified as authentic* by the governor or chief magistrate of the state or territory from whence the person so charged has fled, it shall be the duty of the executive authority of the state or territory to which such person has fled, to cause him to be arrested and secured, and to cause notice of the arrest to be given to the executive authority making such demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear," etc.

We are able to see by this history of the method of extradition among the colonies and states that almost from the first organization of civil society in this country it has been regulated, as to the right of and the method of the exercise of the right, by law. Those who founded the colonies came from countries where personal liberty was not at that time very secure, and they were therefore extremely jealous of any discretionary power founded upon comity or anything else affecting the liberty of the citizen. Hence they sought early in our history to provide by positive enactments, in the shape of compacts or laws, in what cases and in what manner the citizen shall be restrained of his liberty.

There is no doubt of the right of this court, by *habeas corpus*, to inquire into the legality of the arrest of Morgan, as it is alleged in the petition that he is restrained of his liberty contrary to the constitution and laws of the United States. If he is properly held in arrest, it must be by virtue of the constitution and laws of the United States. If he is improperly held, it is in violation of such constitution and the law of congress. This state of the case clearly gives this court jurisdiction, by *habeas corpus*, to inquire whether the governor of Arkansas had the power to honor the requisition of the Cherokee chief; and,

*again*, if he had such power, did he comply with the act of congress in the exercise of it? The state of the case at the time the governor issued the warrant for the arrest of Morgan, as shown by the record before him, is what is to be passed on by this court. The provision of the constitution on the subject of interstate extradition is the fundamental law of the land. This provision, together with the act of congress on the subject passed in pursuance of the constitution, is a part of the supreme law of the land, and is therefore a part of the law of each state. Congress having acted, the law passed by it is the one to be observed in the matter of interstate extradition.

The question most material in this case, and the one going to the very marrow of it, is, could the governor of the state of Arkansas honor a requisition from the chief of the Cherokee Nation by issuing a warrant for the arrest of Morgan that he might be delivered to the agent of the Cherokee Nation? Suppose the act of congress was fully complied with as to the manner of executing this power, is the chief of the Cherokee Nation the executive authority of any state or territory in the sense in which the word "state" is used in the constitution, and the words "state" and "territory" are used in the act of congress? If so, and the demand is made in due form as prescribed by the act of congress, the governor has done no more in causing the arrest of Morgan than to properly exercise the power vested in him by the laws of the United States. The power making the demand must be the chief executive of a state, as required by the constitution, or of a state or territory, as provided by the act of congress.

The question has been raised in argument that the act of congress, so far as it provided that the demand for extradition could be made upon the governor of a state by the chief executive of a territory, was void as being against or beyond the constitution. Of course, congress cannot legislate beyond the power given it by the constitution. The exercise of its legislative authority must be because of a power expressly given, or of one which is necessary to carry out and make effective one expressly given, by the constitution. The constitution uses the word "state" alone, and the act of congress uses the words "state" and "territory." It is a question that will admit of serious discussion. But it must be remembered that, under article 4, § 3, of the constitution, congress has power to make all needful rules and regulations respecting the territory or other property belonging to the United States. Is not this part of the constitution a part of the fundamental law of the land? It is a part of the supreme law of the land, and is therefore a part of the law of each state. Are not all laws deemed necessary to be passed by congress, and within their power under the constitution to pass, binding on the states and to be observed by them? If congress deems it a needful rule or regulation, relating to the territories of the Union, to extradite their fugitive criminals, it has the power to pass such a rule, not, perhaps, under the extradition clause of that instrument, but under the clause

relating to the territories, and this rule is binding on the states, and to be observed and obeyed by them. I believe, therefore, that this part of the act of congress is valid, and the obligation to obey it, on the part of the governors of the respective states, is as binding as when the demand for extradition is made by the governor of a state. But, in my view of this case, this question need not be decided.

There is no doubt that the Hon. D. W. Bushyhead is the chief executive of the Cherokee Nation. But is the Cherokee Nation a state, according to the meaning to be attached to the word as used in the constitution? Without stopping to inquire as to the different meanings of the word "state," we find that it has a definite, fixed, certain, legal meaning in this country and under our form of government. It had acquired this meaning when the constitution was adopted, and this is the one which must be attached to it when used in that instrument, or in laws of congress. What is that meaning? It means one of the commonwealths or political bodies of the American Union, and which, under the constitution, stand in certain specified relations to the national government, and are invested as commonwealths with full power, in their several spheres, over all matters not expressly inhibited. This understanding of a state started with the adoption of the articles of confederation, and was incorporated into the constitution, and, when used in that instrument or in the acts of congress, must be understood to have this meaning. It is a political organization, having a chief executive who can make a requisition for extradition, and whose duty under the law is to obey one when made by one having authority under the constitution and laws of the United States, that is meant.

The word "territory," when used to designate a political organization, has a distinctive, fixed, and legal meaning under our political institutions. We find a continental resolution of October 10, 1780, to be the foundation of our territorial system. This declares that the "demesne or territorial lands shall be disposed of for the common benefit of the United States, and be settled and formed into distinct republican *states,* which shall become members of the federal Union and have the same rights of sovereignty, freedom, and independence as other states." Schouler's Hist. U. S. 98. Again, in 1784, an ordinance was adopted by the congress of the confederation, providing for the division of all the country ceded, or to be ceded, into states, with boundaries ascertained by ordinance. This plan for the establishment of governments for the territories provided for their temporary government by the laws of any one of the states. This ordinance was superseded three years later by the ordinance of 1787, restricted in its application to the territory northwest of the river Ohio. These ordinances were all adopted prior to the adoption of the constitution. Then came the clause of the constitution giving to congress the power to dispose of, and make all needful rules and regulations respecting, the territory or other property belonging to the United States. Ar-

ticle 4, § 3. Then we find the general laws of congress relating to all the territories. A territory, under the constitution and laws of the United States, is an inchoate state,—a portion of the country not included within the limits of any state, and not yet admitted as a state into the Union, but organized under the laws of congress, with a sepparate legislature, under a territorial governor and other officers appointed by the president and senate of the United States.

It seems that the very language of section 1839 of the Revised Statutes of the United States settles the question that the Cherokee Nation is not a territory. It provides that nothing in this title shall be construed to impair the rights of person or property pertaining to the Indians in any territory, so long as such rights remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with any Indian tribe, is not, without the consent of such tribe, embraced within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries and constitute no part of any territory now or hereafter organized, until such tribe signifies its assent to the president to be embraced within a particular territory. On the twenty-third day of May, 1836, the United States and the Cherokee Nation, by the fifth article of a treaty made between them, provided that the United States "hereby covenant and agree that the lands ceded to the Cherokee Nation in the foregoing article shall in no future time, without their consent, be included within the territorial limits or jurisdiction of any state or territory." This article is still in force. The treaty-making power and the Cherokee Nation must have then understood that such tribe or nation was not either a state or territory. Has the *status* or relation of this Indian nation to the United States and the different states in the union changed since the time of this treaty? It has not. That relation is manifestly different from either a state or territory. Both the word "state" and the word "territory" have attached to them, under the constitution and laws of the United States, a technical meaning. The Cherokee Nation does not come within this meaning, but it is a part of what is called "Indian country." Early in the life of the country a certain section of the domain of the nation was set apart as Indian country. By the advancing tide of white population and the formation of new territories first, and then states, much of what was then Indian country has ceased to be such, and has become states in the Union; but the Cherokee Nation maintains the same *status* to-day in its relations to the federal government as it did when first set apart by such government,—not as a state or territory, but as the home of the Indian. These Indians have, from the foundation of the government, been treated as being separate and apart from the states and territories of the Union, and this tribe as well as all others are contradistinguished by a name appropriate to themselves, and one dif-

fering from either a state or a territory. They belong to the republic, though they are neither a state or terrritory in it.

If the law regulating interstate extradition applies to the Cherokee Nation, why was it necessary for the United States to agree, by the second article of the treaty of 1846, that the authorities of the United States should deliver to the Cherokee Nation for trial and punishment all fugitives from justice seeking refuge in the territories of the United States? The law of interstate extradition was in full force at the time, and afforded an effective and complete method of obtaining a fugitive from justice. Then, if this law applied to the Cherokee Nation, why enact this clause of the treaty? It clearly provides for a different process of rendition from that prescribed by the act of congress. By the latter the executives of states and territories are to deliver up fugitives from justice, and by the former the authorities of the United States are to deliver them up. The governor of a state is not an authority of the United States. The constitution of the United States recognizes states, and treats them as commonwealths making up the American Union. It recognizes the existence of territories, and confers upon congress the power to pass laws for their government. It recognizes the existence of the Indian tribes, and confers upon congress the power to regulate commerce with them, and this recognition is of a body of people different from either a state or territory. In pursuance of this power, early in the life of the government, congress declared certain country Indian country, and enacted different laws from those relating to the territories for the government of this Indian country. Through the whole legislative history of the government the Indians have been treated as communities different from a state or territory. Until the act of congress of the third of March, 1871, the different Indian tribes were treated as domestic, dependent nations, with whom the treaty-making power could make treaties as with a foreign nation. This act of congress did not change the relation of the Indian tribes to the United States, but only changed the method of enacting laws for their government. Their relation to the government is the same now as before the passage of this act.

The states and territories are communities of people who are citizens of the United States, and who enjoy the rights and perform the duties of citizens. The Indian tribes are made up of persons who are not citizens of the United States, and who do not enjoy the rights of or perform the duties of citizens. Hardly a congress has been in session for the last 18 years that propositions have not been before it to make the Indian country a territory; and the Indian people have, in protection of their rights, as they believed, persistently opposed such action by congress. Why create the Indian country a territory if it is already one? If the Cherokee Nation is a territory, then the other four civilized tribes, as well as the numerous other Indian tribes, in the Indian country, are territories, and we have,

by the force of the interpretation of the word "territory," a large number of communities of people who were never heard of as territories before, suddenly elevated to the position of inchoate states in the American Union, when, perhaps, not a member of any one of these communities is a citizen of the United States. This would, indeed, be an anomaly unknown to the laws of this country. These Indian tribes have always been considered by every department of the government—legislative, executive, and judicial—as distinct, independent political communities, differing in so many essential particulars from states and territories in the American Union as not to come under the designation of either.

I therefore conclude that the Cherokee Nation is neither a state nor territory, in the sense to be attached to the words when used in the clause of the constitution and in the act of congress relating to interstate extradition, and that, therefore, the governor of Arkansas could not, under the constitution and laws of the United States, issue a warrant for the arrest of Morgan upon the demand of the chief of the Cherokee Nation. This, of course, is decisive of this case.

Other questions are raised in the argument by counsel in regard to the sufficiency of the papers upon which the governor of the state acted. By the act of congress the affidavit or indictment upon which a requisition is based must be certified by the governor or chief magistrate as authentic. This wise provision is to prevent the restraint of liberty by false charges and fraudulent papers; to enable the executive upon whom the demand is made to determine whether there is probable cause for believing a crime has been committed. It must be remembered that this law is one in restraint of liberty, and therefore to be strictly construed and strictly pursued. The affidavit, when this form of evidence is adopted, must be so explicit and certain that if it were laid before a magistrate it would justify him in committing the accused to answer the charge. Hurd, Hab. Corp. 611. The affidavit in this case is the foundation for the requisition of the chief of the Cherokee Nation, and the same is not certified as authentic by him. The representations of the executive of the demanding state are of no effect unless supported by a duly-authenticated copy of an indictment found, or an affidavit made. *Ex parte Thornton*, 9 Tex. 635. The act of congress provides for a method that is summary in its effect, and it must therefore be strictly complied with. This failure to certify to the affidavit by the Cherokee chief, in the manner prescribed by the law of congress, leaves the governor of Arkansas without jurisdiction to act. In the affidavit in this case the affiant says *"that he has reason to believe, and does believe, from information received,* that one Frank Morgan did commit the crime of willful murder." This is a charge upon suspicion, and the constitution of the United States and the law of congress are not satisfied with such a charge. The affiant, Patten, swears to his belief. Suspicion does not warrant the arrest of a party that he may be sent from a state

where he may be found to another, and it may be a distant state. All legal intendments in a case of this kind are to avail the prisoner. *Ex parte Smith*, 3 McLean, 126.

Again, there is nothing on the face of the papers which were before the governor to show that any court in the Cherokee Nation had jurisdiction to try Morgan for the crime of murder. It must appear to the governor honoring the requisition that the tribunals of the demanding state or territory had jurisdiction to try, or else how can a charge of crime be legally made. Charged with crime, in legal parlance, means charged in the regular course of judicial proceedings. A man cannot be legally charged with crime when there is no jurisdiction to try him. The fact that he is so legally charged, means that he is charged by an authority having a right to try. *Kentucky v. Dennison*, 24 How. 66. Right to try means jurisdiction over the place where the crime has been committed, and over the person who commits it. Now, ordinarily, properly charging a man with the crime of murder, in a state or territory, would be sufficient to show jurisdiction to try, because the courts of all the states and territories have jurisdiction to try for the crime of murder, if committed within their boundaries, regardless of who commits the crime and against whom it is committed. But this is not so in the Cherokee Nation. The courts of that nation have jurisdiction, and can only try for the crime of murder when the person murdered is an Indian, and the one charged with the crime is also an Indian. Rev. St. § 2146. And the word "Indian," as used in this connection, means, says the supreme court of the United States, in the case of *U. S.* v. *Rogers*, 4 How. 567, "an Indian by blood; one belonging to the race of Indians as contradistinguished from one who may be a member of the tribe." This jurisdictional fact nowhere appears on the face of the papers submitted to the governor. The affidavit fails to show that either Johnson or Morgan were Indians. It does recite that Johnson was sheriff of Sequoyah district. He might have been such sheriff, under the laws of the nation, if he were a white man and had been adopted into the nation, and this recital does not necessarily show that the courts of that country had jurisdiction to try Morgan for killing him. The requisition of the chief recites that Frank Morgan is a citizen of the Cherokee Nation. That does not of necessity show him to be an Indian, because he may become a citizen and still not be an Indian in the sense attached to that word by the supreme court in the case above cited. In order to give jurisdiction it must appear that both were Indians. The fact that the tribunals of the demanding power had jurisdiction to try gives the right to charge with crime, and demand the extradition of the person charged. No charge can be made when there is no jurisdiction, and no demand can be made where there is no jurisdiction of both person and place. For this reason the governor of the state could not honor the requisition for Morgan. Then, because there is no proper affidavit charging Morgan with mur-

der, and there is nothing showing that he could be tried by the courts of the Cherokee Nation, and therefore such nation had no right to demand him, and because, under the constitution and laws of the United States, the chief of the Cherokee Nation, not being the chief executive of a state or territory, could make no demand upon the governor of the state of Arkansas for the extradition of Morgan, it must be held that the warrant of the governor of the state of Arkansas, issued for the arrest of Morgan, and by which he is now held, is void, and he is illegally restrained of his liberty, and the prayer of his petition must therefore be granted, and he will be discharged.