**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Rafael LIRA, Defendant-Appellant.**

**No. 716, Docket 74–2567.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 27, 1975.

Decided April 14, 1975.

John C. Corbett, Brooklyn, N. Y., for defendant-appellant.

James E. Nesland, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S.D.N.Y., John D. Gordan, III, Asst. U. S. Atty., New York City, of counsel), for plaintiff-appellee.

Before MANSFIELD, OAKES and TIMBERS, Circuit Judges.

MANSFIELD, Circuit Judge:

Rafael Lira, whose true name is Rafael Mellafe, appeals from a narcotics conviction entered against him in the Southern District of New York after a jury trial before Judge Charles E. Stewart.

Prior to the trial defendant moved to dismiss the indictment against him, alleging that, since he had been illegally abducted from Chile and tortured by agents of the United States Government, dismissal was mandated by our decision in United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974). After an evidentiary hearing of the type prescribed by us in *Toscanino*, Judge Stewart denied the motion. We agree that "the *Toscanino* case does not control this matter," and affirm.

At the evidentiary hearing Mellafe testified that on March 7, 1974, he was arrested at the home of his common law wife in Santiago by Chilean police officers who took him to a local police station. According to his testimony he was blindfolded by the Chilean police, beaten, strapped nude to a box spring, tortured with electric shocks, and questioned about the whereabouts of one Christian Alvear, who had been named as a co-conspirator with Mellafe in the indictment forming the basis of the proceedings below. During this process, Mellafe testified, he heard English being spoken in a low tone, but he neither knew nor was told the identity of the English-speaking persons. He stated that after being held at the local police station for four days he was transferred to the Chilean Naval Prison at Valparaiso where he was held for about three weeks, during which period he was beaten and tortured.

Mellafe further testified that he was thereafter taken before the Chilean Naval Prosecutor where he was questioned again about Christian Alvear and about illegal firearms transactions. On May 3, 1974, he was forced to sign a decree expelling him from Chile and was photographed, being told that some Americans were waiting for his photograph. At this time Mellafe says he saw in a hallway outside the Chilean Prosecutor's office two men who were identified to him by Jorge Dabed, a fellow prisoner, as Special Agents Charles Cecil and George Frangulis of the U.S. Drug Enforcement Administration ("DEA"). Mellafe testified that finally he was taken to Pudahuel Airport and examined by a person

thought by him to be an American physician, who gave him some pills. On May 4, 1974, he was placed aboard a plane, on which were Cecil, Frangulis and eight Chilean policemen. All but Frangulis then made the flight to New York, where Mellafe was arrested on arrival.

Special Agent Cecil, a DEA representative in Chile, testified that Mellafe had been arrested at the request of the DEA and that the United States Government had also requested an expulsion order.[1] According to Cecil, the DEA had conducted a limited investigation of Mellafe before his arrest. Cecil also acknowledged that the DEA had received a report of Mellafe's arrest and that the Chilean police kept the DEA office aware of Mellafe's place of incarceration in anticipation of the granting of the United States Government's request for an expulsion order. He denied, however, that he had ever met Mellafe before he was placed aboard the plane in Santiago or that either he or Frangulis, another DEA representative in Chile, had received any reports from the Chilean police concerning Mellafe after his arrest other than the infrequent advice as to his whereabouts. Cecil stated that the DEA was in no way involved with the investigation conducted by the Chilean police. Finally, he testified that he accompanied Mellafe from Chile to New York together with six Chilean police officers, six agents of the DEA and a physician whom Chilean authorities had provided.

### Discussion

■ In general a court's power to bring a person to trial upon criminal charges is not impaired by the forcible abduction of the defendant into the jurisdiction. Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1888); Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). However, in United States v. Toscanino, supra, we held that this general rule, sometimes referred to as the "Ker-Frisbie doctrine," is subject

to the overriding principle that where the Government itself secures the defendant's presence in the jurisdiction through use of cruel and inhuman conduct amounting to a patent violation of due process principles, it may not take advantage of its own denial of the defendant's constitutional rights. We there stated that a district court must "divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary, and unreasonable invasion of the accused's constitutional rights." 500 F.2d at 275. More recently in United States ex rel. Lujan v. Gengler, 510 F.2d 62 (2d Cir. 1975), we reaffirmed the principle that the Ker-Frisbee doctrine does not bar judicial scrutiny of "conduct of the most outrageous and reprehensible kind by United States government agents," which results in denial of due process, 510 F.2d at 65, although we there found that the Government conduct did not reach the level proscribed by Toscanino.

■ Essential to a holding that Toscanino applies is a finding that the gross mistreatment leading to the forcible abduction of the defendant was perpetrated by representatives of the United States Government. In Toscanino, for instance, we stated that upon remand the defendant would be required to establish "that the action was taken by or at the direction of United States officials," 500 F.2d at 281. In the present case a suspicion of United States involvement in the Chilean police actions might arise from the fact that the Chilean officials appear to have been most cooperative in honoring the DEA's requests, even going so far as to provide a sizeable Chilean escort on the plane to the United States. But the evidentiary hearing produced no proof that representatives of the United States participated or acquiesced in the alleged misconduct of the Chilean officials. While we would have preferred a finding on this key issue by the district judge, the

---

1. Under the Extradition Treaty between the United States and Chile, a Chilean national, which Mellafe was, cannot be extradited to the United States.

record fails to reveal any substantial evidence that Chilean police were acting as agents of the United States in arresting or mistreating Mellafe or that United States representatives were aware of such misconduct.

The only suggestion of possible involvement on the part of United States officials comes from Mellafe's testimony that he heard English spoken during the time of his torture in Santiago, that he saw the Special Agents at the Naval Prosecutor's office, and that he was told that his photograph was "for the Americans." However there was no evidence that American agents were present at or privy to his interrogation or that the persons overheard to speak English were Americans, much less Government agents. Agent Cecil, furthermore, testified that he was not at the prosecutor's office or aware of the activities of the Chilean police, and that he did not see Mellafe until he boarded the plane on May 4, 1974. Thus on this record there was no direct evidence of any misconduct on the part of the United States Government.[2]

Although no direct involvement by the Government in Mellafe's torture could be proven, appellant nevertheless suggests that the Government was "vicariously responsible" for his torture, since the DEA requested Mellafe's arrest and expulsion and thus "placed the matter in motion." This argument must be rejected. Unlike *Toscanino*, where the defendant was kidnapped from Uruguay in defiance of the laws of the country, here the Government merely asked the Chilean Government to arrest and expel Mellafe in accord with its own procedures. This action can hardly be faulted. Agencies such as the DEA presumably must cooperate with many foreign governments in seeking transfer to the United States of violators of United States law. The DEA can hardly be expected to monitor the conduct of representatives of each foreign government to

assure that a request for extradition or expulsion is carried out in accordance with American constitutional standards. Moreover, no purpose would be served by holding the Government responsible for the actions of Chilean police. Our decision in *Toscanino* was grounded on the same principle which underlay the Supreme Court's adoption of the exclusionary rule in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In both cases the purpose of the rule was to deter police misconduct by barring "the government from realizing directly the fruits of its own deliberate and unnecessary lawlessness in bringing the accused to trial," 500 F.2d at 272. Hopefully divestiture of jurisdiction over a defendant forcibly abducted by our Government from a foreign jurisdiction would inhibit our Government from engaging in similar unlawful conduct in the future. However, where the United States Government plays no direct or substantial role in the misconduct and the foreign police have acted not as United States agents but merely on behalf of their own government, the imposition of a penalty would only deter United States representatives from making a lawful request for the defendant and would not deter any illegal conduct. Since our Government has no control over the foreign police, extension of *Toscanino* to the present case would serve no purpose.

Appellant's final argument is that Chilean law was violated when the Chilean Government issued an expulsion decree directing that he be sent to the United States. However, since Chile was aware of the alleged violations on the part of its own officials and did not object or take remedial action, this argument is of no avail to appellant. See United States ex rel. Lujan v. Gengler, *supra*, 510 F.2d at 68. Furthermore, in dealing with a foreign government, the DEA agents were entitled to rely on that government's interpretation and en-

---

**2.** Even if Mellafe's testimony that he saw Cecil and Frangulis at the Naval Prosecutor's office were taken to suggest direct Government involvement with Chilean police activities at that point, no divestiture of jurisdiction would be required since Mellafe suffered no mistreatment after the time of his interview with the Prosecutor.

forcement of its own laws. The United States Government did not owe appellant any obligation to enforce his asserted right under Chilean law.

Affirmed.

OAKES, Circuit Judge (concurring):

While I concur in the result, I find the case more troublesome perhaps than does the majority. Having sat on both United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974), and United States ex rel. Lujan v. Gengler, 510 F.2d 62 (2d Cir. 1975), and now on this case, I agree that this case falls—just barely—on the *Lujan* rather than the *Toscanino* side of the line. But since this is the third case in our court of DEA abduction from abroad, and we were told on argument that there were six more likely to come before us, one is led to wonder whether, by giving further countenance to this kind of conduct by law enforcement agents, we are forgetting the admonitions, albeit in Fourth Amendment contexts, of the judicial lions of the past— Mr. Justice Brandeis's ringing phrases in dissent in Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928);[1] Judge Learned Hand's re-

mark in United States v. Kirschenblatt, 16 F.2d 202, 203 (2d Cir. 1926);[2] Mr. Justice Frankfurter's essay also in dissent in Harris v. United States, 331 U.S. 145, 172, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947).[3]

I recognize that only the other day, citing Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), and Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), the Supreme Court said "Nor do we retreat from the established rule that illegal arrest or detention does not void a subsequent conviction." Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). We are, of course, bound by Supreme Court decisions as evidenced by *Lujan, supra.* In addition to what Judge Manfield said in *Toscanino,* 500 F.2d at 277–79, it is well to point out, however, that there is a very strong policy which would be operative if the abduction here were from an objecting country (as was allegedly the case in *Toscanino* ) or in violation of a treaty. Cook v. United States, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933); United States v. Rauscher, 119 U.S. 407, 422, 7 S.Ct. 234, 30 L.Ed. 425 (1886).[4] That policy is of course respect

1. Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

2. Nor should we forget that what seems fair enough against a squalid huckster of bad liquor may take on a very different face, if used by a government determined to suppress political opposition under the guise of sedition.

3. Stooping to questionable methods neither enhances that respect for law which is the

most potent element in law enforcement, nor, in the long run, do such methods promote successful prosecution. In this country police testimony is often rejected by juries precisely because of a widely entertained belief that illegal methods are used to secure testimony. Thus, dubious police methods defeat the very ends of justice by which such methods are justified. No such cloud rests on police testimony in England. Respect for law by law officers promotes respect generally, just as lawlessness by law officers sets a contagious and competitive example to others. See IV Reports of the National Commission on Law Enforcement and Observance ("Lawlessness in Law Enforcement") *passim*, especially pp. 190–92. Moreover, by compelling police officers to abstain from improper methods for securing evidence, pressure is exerted upon them to bring the resources of intelligence and imagination into play in the detection and prosecution of crime.

4. *Rauscher* was handed down the same day as *Ker* and written by the same author, Mr. Justice Miller. His distinction between treaty obligations and unwritten obligations of customary international law I find untenable. *See*

for the law of nations, the requirements of world society, and the integrity and independence of other nations, not only under formal charters like those of the United Nations (art. 2, para. 4) and the Organization of American States (art. 17), but as unwritten obligations of international law. *See* Garcia-Mora, Criminal Jurisdiction of a State over Fugitives Brought from a Foreign Country by Force or Fraud: A Comparative Study, 32 Ind.L.J. 427 (1957). *See also* The Paquette Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900). That respect for the sovereign integrity of other nations is, in addition to conforming to high moral principles, a self-serving pragmatic viewpoint for the United States to take; we can better demand in the international court of public opinion similar respect for our sovereign integrity if we extend such respect to others. Nothing in *Lujan* is to the contrary.

Finally it should be said that, regardless of the abstract doctrine *Ker* and *Frisbie* are said to stand for, we can reach a time when in the interest "of establishing and maintaining civilized standards of procedure and evidence," we may wish to bar jurisdiction in an abduction case as a matter not of constitutional law but in the exercise of our supervisory power under McNabb v. United States, 318 U.S. 332, 340, 63 S.Ct. 608, 87 L.Ed. 819 (1942), and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). As we pointed out in *Toscanino, supra,* that "supervisory power is not limited to the admission or exclusion of evidence, but may be exercised in any manner necessary to remedy abuses of a district court's process." 500 F.2d at 276. To my mind the Government in the laudable interest of stopping the international drug traffic is by these repeated abductions inviting exercise of that supervisory power in the interests of the greater good of preserving respect for law.

Garcia-Mora, Criminal Jurisdiction of a State over Fugitives Brought from a Foreign Country by Force or Fraud: A Comparative Study, 32 Ind.L.J. 427, 441–42 (1957).