**Thomas D. DAVIS, Appellant,**

v.

**Bryant MUELLAR, as Sheriff of Rolette County, North Dakota, Appellee.**

**No. 80–1082.**

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1980.

Decided March 6, 1981.

Rehearing and Rehearing En Banc Denied April 3, 1981.

Timothy A. La France, Native American Rights Fund, Boulder, Colo., for appellant.

Vance Gillette, Bismarck, N. D., for amicus curiae.

Arne F. Boyum, Rolette County State's Atty., Rolla, N. D., for appellee.

Before HENLEY and McMILLIAN, Circuit Judges, and HARPER,* Senior District Judge.

HENLEY, Circuit Judge.

Thomas D. Davis appeals the district court order, 481 F.Supp. 888, denying his petition for a pretrial writ of habeas corpus, 28 U.S.C. § 2241(c)(3), by which he sought release from North Dakota state custody on grounds that his arrest and state custody were, and are, in violation of a tribal extradition ordinance. We affirm.

Davis is an enrolled member of the Turtle Mountain Band of Chippewa Indians. The tribal extradition ordinance, first approved by the United States Bureau of Indian Affairs on June 13, 1967, mandates the following procedure in arresting a tribal member for a crime committed off the reservation: the state officials present the arrest warrant to tribal officials, the tribal officials make the arrest, and the Indian accused has an extradition hearing as a prerequisite to state custody. Turtle Mountain Tribal Code § 1.0710.[1]

The Turtle Mountain Indian Reservation is composed of two townships in Rolette County, North Dakota. Indian land in the County, but outside the reservation, makes up another two townships. The resulting patchwork of Indian and state jurisdiction requires close cooperation between Indian and state officials, and there is no reason to believe that in general such cooperation does not exist. Specifically, with respect to the arrest of Davis subjective bad faith is denied.

On the night of October 9, 1978 Davis allegedly made a telephone call from the Reservation in which he threatened to kill one Kim Albert the next day at the Town of Rolla.[2] The alleged threat was reported

---

* The Honorable Roy W. Harper, United States Senior District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

1. Turtle Mountain Tribal Code (1976) provides in part:

   1.0710. *Extradition.* Any Indian found within the boundaries of the Turtle Mountain Indian Reservation who is wanted by State authorities for a violation of State law committed outside the jurisdiction of the Turtle Mountain Tribal Court, and a warrant of arrest having been issued from a State Court, may be arrested and taken into custody by Bureau of Indian Affairs or Tribal law enforcement personnel for prompt transfer to the appropriate enforcement agency. The arrest and removal of the fugitive will be accomplished in accordance with the procedure set forth herein; Copies of State warrants may be presented to the Agency Branch of Law and Order whereupon they will be recorded as to date and time received. The warrant will be promptly presented to the Tribal or Trial Court Judge of the Turtle Mountain Tribal Court for a review as to date, charge, and person named thereon, to determine its apparent validity. The Judge, after satisfying himself or herself as to the apparent validity of the warrant, will issue an order for the arrest of the alleged fugitive from justice.

   All Indians being taken into custody as provided in the preceding paragraph shall be taken by the police officer to the Turtle Mountain Tribal Court where the Judge shall hold a hearing to determine only whether the Indian person in custody and before the Court is the same person charged on the face of the warrant. An Indian may waive such hearing by executing a waiver of removal hearing and he will be promptly turned over to the custody of the appropriate State official. Where a State warrant is issued from a State other than the State wherein the Indian Court is located, the warrant should be presented to the Tribal Court by the Sheriff of the County in which the reservation is located. Upon assurance by the local sheriff that the out-of-state agency will extradite the wanted subject, the procedure governing the arrest of the wanted fugitive may be completed as in other cases. After a hearing, as provided in paragraph (2) above, if the Judge is satisfied the fugitive is the same person named in the State warrant, the Judge shall issue an appropriate order to that effect which will authorize the State official to remove the fugitive from the Turtle Mountain Indian Reservation. In all cases wherein Indians are arrested by reservation law and order personnel the requesting agency supplying the warrant shall be immediately notified that the subject is in custody and will be delivered to a proper official within a reasonable time to transfer the fugitive to their particular jurisdiction.

2. Davis was subsequently charged with terrorizing, a Class C felony under N.D.Cent.Code § 12.1–17–04, for allegedly making the threatening phone call to Kim Albert concerning an incident in which Albert struck Davis' wife. Albert received the call in Rolla, an off-reservation town, on October 9, 1978.

to Rolette County officials who determined to arrest Davis the following morning.

On the morning of October 10, 1978 the tribal police department, obviously acting in cooperation with the Rolette County sheriff's office, notified Davis at his place of employment on the reservation that the county officers wished to speak with him and asked him to come to the Tribal Law and Order Office, which he did. After a short time a deputy sheriff arrived and Davis was arrested without a warrant. The record reflects that Davis refused to waive extradition and requested a hearing. However, no tribal judge was available nor was one to be available that day. In those circumstances Rolette County officials elected to take Davis into custody even though they were aware of the requirements of the extradition ordinance.

After Davis was placed in state custody, a complaint was filed, a warrant was issued, and bond was set at $1,500.00. Later that afternoon, Davis' wife posted bond at the Rolette County sheriff's office in Rolla. Davis was released, but the terms of his bond required him to appear in the state courts.[3]

Davis presented his unlawful arrest claims to North Dakota state courts in four separate appearances. At his preliminary hearing in county justice court, Davis moved for a dismissal on the basis that the state arrest and custody of him on the reservation violated his rights under the tribal extradition ordinance and frustrated the federal guarantee of tribal self-government. This motion was denied, and he was bound over to the state district court. Then, Davis petitioned the state district court for a writ of habeas corpus, releasing him from state custody until the tribal extradition ordinance had been complied with.

The writ was denied on the ground that he was not "in custody."[4] At the time of his arraignment in state district court, Davis again moved to dismiss on the basis of violation of tribal extradition laws but was denied relief. Finally Davis sought a writ of prohibition from the Supreme Court of North Dakota to restrain the impending district court prosecution. Without reaching the issue of the lawfulness of the arrest, the state supreme court denied the writ, noting that prohibition is granted only sparingly and only where there is no adequate remedy by appeal. *Davis v. O'Keefe*, 283 N.W.2d 73, 76 (N.D.1979).

Davis then took his claim to federal court. He petitioned the United States District Court for the District of North Dakota for a writ of habeas corpus based on the tribal extradition ordinance. By an order dated December 27, 1979, the district court denied the petition on the grounds that Davis had not exhausted state remedies because he had not yet been tried and convicted and that there were no special circumstances to override the exhaustion requirement. An administrative panel of this court granted a certificate of probable cause and directed that the state criminal proceeding be stayed pending appeal.

## I. Federal Judicial Intervention.

At the outset we are confronted with the question whether this court should assume jurisdiction and decide this case on its merits.

Davis contends that the special circumstances of this case negate the need for exhaustion of state remedies. Alternatively, he contends that state remedies have been exhausted. He asserts that the

---

3. Davis did not waive lack of jurisdiction by posting bond and making special appearances before the courts. *Albrecht v. United States*, 273 U.S. 1, 9, 47 S.Ct. 250, 253, 71 L.Ed. 505 (1926). Indeed, habeas corpus relief would include return of the posted bond.

4. For federal purposes, Davis is "in custody." *Kolski v. Watkins*, 544 F.2d 762, 763 n.2 (5th Cir. 1977); *United States ex rel. Scranton v. New York*, 532 F.2d 292, 293–94 (2d Cir. 1976). North Dakota apparently requires allegation of confinement in a petition for state habeas corpus. *See Fournier v. Roed*, 161 N.W.2d 458, 470 (N.D.1968) (Knudson, J., concurring specially).

unique status given tribal sovereignty constitutes a special circumstance.[5]

■ Public policy and 28 U.S.C. § 2283 [6] discourage federal court interference with state court proceedings. *Younger v. Harris,* 401 U.S. 37, 40–41, 91 S.Ct. 746, 748–749, 27 L.Ed.2d 669 (1971). *Younger,* which dealt with a federal stay or injunction of a pending state criminal prosecution, was based on "the notion of 'comity,' that is, a proper respect for state functions." *Id.* at 43–44, 91 S.Ct. at 750. The same policy has been applied to federal habeas corpus relief from a state criminal trial. *E. g., Kolski v. Watkins,* 544 F.2d 762, 766 (5th Cir. 1977); *United States ex rel. Scranton v. New York,* 532 F.2d 292, 295 (2d Cir. 1976); *United States ex rel. Tyler v. Hall,* 444 F.Supp. 104, 106 (E.D.Mo.1978). However, the rule of comity does not limit the power of the federal courts to dispense with the exhaustion requirement altogether where "special circumstances" exist. *E. g., Braden v. Thirtieth Judicial Circuit Court,* 410 U.S. 484, 489, 93 S.Ct. 1123, 1126–1127, 35 L.Ed.2d 443 (1973) (speedy trial rights); *Ex parte Royall,* 117 U.S. 241, 251, 6 S.Ct. 734, 740, 29 L.Ed. 868 (1886); *United States ex rel. Russo v. Superior Court,* 483 F.2d 7, 12 (3d Cir.), *cert. denied,* 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 313 (1973) (double jeopardy).

■ The federal district court held that requiring Davis to defend himself in a criminal trial would not justify habeas corpus relief under the "both great and immediate" irreparable injury test of *Younger.* As the district court noted, while Davis has exhausted his pretrial state remedies he could appeal a state conviction on the ground of the unlawfulness of the arrest.[7] And as *Younger* teaches, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution could not by themselves be considered "irreparable" in the special legal sense of that term. Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution. *Younger v. Harris,* 401 U.S. at 46, 91 S.Ct. at 751.

As stated, it is urged here that serious questions of tribal sovereignty and state-tribal relations are raised to such an extent as to constitute special circumstances justifying dispensing with exhaustion requirements as contemplated by *Braden* and *Russo.*

The Turtle Mountain Band of Chippewa Indians has appeared amicus curiae and has undertaken to raise questions as to the extent to which the state must recognize sovereignty and control of the tribal government over the reservation's inhabitants. Thus, it may be said that in a sense we are to be concerned not only with the personal injury to Davis but with broader tribal interests as well.

■ Tribal sovereignty undoubtedly includes the power to establish a court system. American Indian Policy Review Commission, 95th Cong., 1st Sess., Final Report (Comm.Print 1977), at 99 (hereinafter Final Report), and the trust responsibility of the federal government includes protecting tribal sovereignty. *Id.* at 104.[8] Indeed, the

---

**5.** Davis also argues that state officials' knowing and willful violation of tribal ordinances constituted special circumstances. However, the district court found that there was no showing of bad faith or harassment. We see no need to overturn that finding.

**6.** 28 U.S.C. § 2283. Stay of State Court Proceedings.

A court of the United States may not grant an injunction to stay the proceedings in a State Court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

**7.** A conviction is rarely overturned on the ground of unlawfulness of the arrest so long as fruits of the illegal arrest are not used at trial. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Even where the illegal extradition does not invalidate a subsequent conviction, the defendant may have a cause of action under 42 U.S.C. § 1983. *See Brown v. Nutsch,* 619 F.2d 758 (8th Cir. 1980), and cases cited therein.

**8.** A refusal of state police officers to recognize legitimate tribal judicial authority while on the reservation is at least to some extent state interference with tribal sovereignty. *E. g., Fisher v. District Court,* 424 U.S. 382, 96 S.Ct.

federal courts historically have protected tribal sovereignty from state interference. *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); *McClanahan v. Arizona Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 561, 8 L.Ed. 483 (1832). Moreover, considerations of comity underlying *Younger* to a degree may be said to apply to tribal governments as well.[9] And if we were presented with a claim filed to protect the extradition process prior to surrender of the individual petitioner to the demanding state considerations of comity and concern for tribal sovereignty might well dictate exercise of federal jurisdiction.

Such a pre-surrender case decided before *Younger* was *Arizona ex rel. Merrill v. Turtle*, 413 F.2d 683 (9th Cir. 1969), *cert. denied*, 396 U.S. 1003, 90 S.Ct. 551, 24 L.Ed.2d 494 (1970). In *Merrill* after the Navajo Tribal Court declined to extradite a reservation Indian to Oklahoma, Arizona honored an extradition demand by Oklahoma and arrested the Indian on the reservation. The habeas corpus petition was brought in the asylum jurisdiction (Arizona) to prevent the demand jurisdiction (Oklahoma) from taking custody of him. The federal court entertained the petition and it was granted on the ground that Arizona had no extradition jurisdiction over Indian residents of the Navajo Reservation which would justify an arrest on the Reservation upon a demand from Oklahoma.

█ But *Merrill* is not the case before us. Here, Davis is in custody of North Dakota. There is a pending state criminal prosecution in which Davis' rights may be recognized and we are convinced that neither the asserted tribal interest, Davis' individual interest, nor any combination of the two justifies our exercise of habeas jurisdiction.

From what has been said, it is clear that the judgment of the district court should be affirmed and this opinion brought to a close. Even so, the position taken by the dissent seems to call for a statement on the merits and we undertake a brief discussion of the personal jurisdiction issue despite some misgiving brought on by *Firestone Tire & Rubber Co. v. Risjord*, ⸺ U.S. ⸺, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981), in which the Supreme Court held that this court in *In re Multi-Piece Rim Products Liability*, 612 F.2d 377 (8th Cir. 1980), having decided it had no jurisdiction of an interlocutory appeal erred in ruling prospectively on the merits of the appeal.

## II. Personal Jurisdiction.

The traditional rule is that a state court maintains personal jurisdiction over a defendant brought before the court by unlawful means. *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 112, 96 L.Ed. 651 (1952). This has been the law at least since the 1880's when an officer from Kentucky arrested in West Virginia and abducted therefrom one Mahon who was a fugitive from a murder charge in Kentucky, *Mahon v. Justice*, 127 U.S. 700, 8 S.Ct. 1204, 32 L.Ed. 283 (1888), and when an officer commissioned by the United States illegally abducted from Peru and brought to California a fugitive from a felony charge pending in Illinois, *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1888).

█ Personal jurisdiction, once obtained, continues and illegality of arrest may not serve as grounds for attack on a subsequent conviction. *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865–866, 43 L.Ed.2d 54 (1975); *Frisbie v. Collins, supra; Pruitt v. Hutto*, 542 F.2d 458, 459 (8th Cir. 1976).

Only in *United States v. Toscanino*, 500 F.2d 267, 274–79 (2d Cir. 1974), has a court

---

943, 47 L.Ed.2d 106 (1976); *United States v. Mazurie*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975).

9. Davis suggests that the principle of comity itself mandates respect for tribal law, as the law of a third independent sovereign, citing *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct.

1079, 55 L.Ed.2d 303 (1978). While it is clear that tribal reservation sovereignty is not congruent with state sovereignty, such sovereignty as the tribes do possess is entitled to recognition and respect both by state and federal governments.

carved out an exception to the illegal arrest rule. In *Toscanino* the court remanded for an evidentiary hearing concerning the defendant's allegation that he was illegally kidnapped from Uruguay and transported to the United States in a manner which "shocked the conscience" of the court. That exception was expressly limited by the Second Circuit in *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 65 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975), to egregious incidents, as in *Toscanino*, which shock the conscience.

The facts of this case simply do not suggest the type of shocking conduct described in *Toscanino, supra,* 500 F.2d at 274–79, that would provide grounds for granting appellant's requested relief.

In a case involving an alleged illegal arrest in Indian country and a claim that illegality of the arrest without extradition divested a state court of jurisdiction to try a habeas petitioner, this court recently followed the general rule and refused habeas relief. *Weddell v. Meierhenry*, 636 F.2d 211 (8th Cir. 1980).

■ As we understand the dissent, it does not quarrel with the general rule. Rather, it bases jurisdiction and its reasoning on the merits on the special status of Indian tribes in the United States and special governmental interest in Indian self-government. We do not disagree that there is a special and unique relationship between the government and the tribes nor do we question the power of the United States to alter the *Ker-Frisbie* personal jurisdiction rule. But we are unable to find that the United States has by policy, by treaty, by statute or by court decision decreed North Dakota's loss of personal jurisdiction over appellant as a penalty for having arrested appellant in violation of the tribal extradition ordinance here involved.

We direct dissolution of the interlocutory stay heretofore entered by this court and affirm the judgment of the district court.

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent. Because of federal protection of tribal sovereignty, I would reverse and grant a writ of habeas corpus [1] releasing Davis from state custody until Rolette County officials comply with the Turtle Mountain tribal extradition ordinance.

I. *Federal Jurisdiction*

As the majority noted, the injury to Davis personally is not the primary interest being asserted here. The issue is not whether an Indian can avoid state prosecution for crimes committed off the reservation, but whether the state must recognize some degree of sovereignty and control of the tribal government over the reservation's inhabitants. On that issue the district court stated, "Tribal sovereignty and state-tribal relations ... do not rise to the standard of special circumstances contemplated in *Braden* and *Russo*." *Davis v. Muellar*, 481 F.Supp. 888, 891 (D.N.D.1979). I disagree.

Tribal sovereignty includes the power to establish a court system. American Indian Policy Review Commission, 95th Cong., 1st Sess., Final Report 99 (Comm.Print 1977) (hereinafter Final Report). The trust responsibility of the federal government includes protecting tribal sovereignty. *Id.* at 104. The refusal of state police officers to recognize legitimate tribal authority while on the reservation is a classic example of state interference with tribal sovereignty. *E. g., Fisher v. District Court*, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976); *United States v. Mazurie*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). Because the tribes are often at a loss to remedy such state interference, the federal courts [2] have

---

1. Davis petitioned for *pre-trial* writ of habeas corpus, 28 U.S.C. § 2241(c)(3), and subsequently moved for certificate of cause for appeal, 28 U.S.C. § 2253. The district court, however, treated this as a § 2254 petition on behalf of a person in custody pursuant to the *judgment* of

a state court. See discussion of *Weddell v. Meierhenry, infra,* p. 530.

2. Congress has also protected tribal self-government. Indian Reorganization Act, 25 U.S.C. §§ 476, 477; 18 U.S.C. §§ 1151, 1152;

historically protected tribal sovereignty from state interference. *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 561, 8 L.Ed. 483 (1832). The first federal court[3] that considered an Indian's habeas corpus petition[4] based on violation of the tribal extradition law[5] did so before *Younger.* That court took jurisdiction and granted habeas corpus relief on the ground that control of the extradition process was essential to tribal sovereignty. *Arizona ex rel. Merrill v. Turtle*, 413 F.2d 683 (9th Cir. 1969), *cert. denied*, 396 U.S. 1003, 90 S.Ct. 551, 24 L.Ed.2d 494 (1970). Where tribal sovereignty is at stake, I believe that federal jurisdiction should still be available, under the special circumstances exception to *Younger.*

The primary purpose of an extradition law is to permit limited inquiries by the asylum jurisdiction into the criminal process utilized by the demanding jurisdiction prior to releasing custody of the fugitive. Certainly a state, in the exercise of its own sovereign powers, claims an interest in the extradition of any fugitive who is present in its jurisdiction. But the district court in the present case would delay consideration of a violation of the tribal extradition law not only until after custody is surrendered but also until after the fugitive is tried and convicted. Such a delay would defeat the purpose of this essential function of the Turtle Mountain Band's self-government. The tribal extradition process would be meaningless, and the Turtle Mountain Band would have no adequate remedy. Violation of tribal extradition laws is impermissible state interference with tribal sovereignty. This is not to say that reservations have identical sovereign status with the states, but rather that such degree of sovereignty as the tribes do possess must be recognized by the states and will be protected by the federal courts from state interference. Therefore, I believe that tribal sovereignty does rise to the standard of special circumstances which justify dispensing with the exhaustion requirement.[6]

## II. *Personal Jurisdiction*

Having decided that we are not precluded by *Younger* from hearing the appeal, I would turn to the substantive issue of whether the state court retains personal jurisdiction over Davis despite the state's

---

Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301 *et seq.*; Indian Financing Act of 1974, 25 U.S.C. § 1451 *et seq.*; and Indian Self-Determination Act, 25 U.S.C. § 450 *et seq.* See discussion, *infra*, p. 531.

**3.** In *Arizona ex rel. Merrill v. Turtle*, after the Navajo Tribal Court declined to extradite a reservation Indian to Oklahoma, Arizona honored an extradition demand by Oklahoma and arrested the Indian on the reservation. The habeas corpus petition was brought in the asylum jurisdiction (Arizona) to prevent the demand jurisdiction (Oklahoma) from taking custody of him. Thus, there was no *Ker-Frisbie* problem. See discussion, *infra*, p. 529.

**4.** Similarly, in *Moe v. Confederated Salish & Kootenai Tribes*, suit for declaratory and injunctive relief was brought shortly after the arrests and the district court granted the Indians relief without even considering *Younger* abstention. 392 F.Supp. 1297 (D.Mont.1974); and 392 F.Supp. 1325 (D.Mont.1975). *See Moe v. Confederated Salish & Kootenai Tribes*, 425

U.S. 463, 468 n.5, 96 S.Ct. 1634, 1639 n.5, 48 L.Ed.2d 96 (1976).

**5.** *High Pine v. Montana*, 439 F.2d 1093 (9th Cir. 1971), was a habeas corpus action by an Indian arrested on the reservation but there was no violation of the tribal ordinance because he was arrested by the tribal police and surrendered by the tribal authorities. Therefore, there was no state interference with tribal sovereignty. Furthermore, he had signed a waiver of right to extradition proceedings. *Curtis v. Bennett*, 351 F.2d 931 (8th Cir. 1965) (such waivers are valid).

This court recently reviewed *Weddell v. Meierhenry.* See discussion, *infra*, p. 530.

**6.** Alternatively, Davis contends that state remedies had been exhausted. Davis had presented his federal claims to the state courts in four proceedings, including one before the highest state court. In light of my conclusion that exhaustion of state remedies was not required, however, I would leave open the question of whether the exhaustion requirement would have been satisfied.

violations of the tribal extradition code. This is a difficult issue because the state's interest in maintaining jurisdiction over one accused of a state crime is in direct conflict with the tribe's interest in self-government. I would hold that the state court does not have jurisdiction to try an Indian brought before it in violation of the tribal extradition ordinance.

The traditional rule is that the court maintains personal jurisdiction over a defendant brought before the court by unlawful means. *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 112, 96 L.Ed. 651 (1952); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1888). *Ker* involved extradition [7] (prisoner kidnapped from Peru "in total disregard of that treaty"; no violation of provisions of treaty), while *Frisbie* involved rendition [8] (prisoner abducted by force from Illinois and brought to Michigan for trial). The *Ker-Frisbie* rule has two related components. First, a treaty of extradition creates rights only as to the sovereign; it does not confer a right of asylum on the fugitive. *Ker v. Illinois, supra*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421; *Siegel v. Edwards*, 566 F.2d 958, 960 (5th Cir. 1978). Therefore, an objection by the asylum jurisdiction to the illegal arrest may affect the jurisdiction of the demanding jurisdiction. *See Ker v. Illinois, supra*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421; *United States v. Lira*, 515 F.2d 68, 71–72 (2d Cir.), cert. denied, 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975); *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 67–68 (2d Cir.), cert. denied, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975). Second, the fourth amendment does not extend to extraterritorial actions or actions by foreign agents. *Frisbie v. Collins, supra*, 342 U.S. 519, 72 S.Ct. 112, 96 L.Ed. 651; *United States v. Busic*, 592 F.2d 13, 23 (2d Cir. 1978). The *Ker-Frisbie* rule is inapplicable where the United States has by treaty imposed a territorial limitation on its own authority. *Cook v. United States*, 288 U.S. 102, 121–22, 53 S.Ct. 305, 312, 77 L.Ed. 641 (1933).

In *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), the Second Circuit created an exception to the *Ker-Frisbie* rule, but later limited the exception to "degrading, egregious, outrageous and flagrant indignities to human personality." *United States v. Winter*, 509 F.2d 975, 986 n.36 (5th Cir. 1975). *E. g., United States v. Lira, supra*, 515 F.2d at 71–72 (abduction after torture by foreign official upheld); *United States ex rel. Lujan v. Gengler, supra*, 510 F.2d at 67–68 (abduction in absence of torture upheld). In *Bennally v. Marcum*, 89 N.M. 463, 553 P.2d 1270 (1976), on facts comparable to those at bar,[9] the Supreme Court of New Mexico held that violation of the tribal extradition ordinance barred state prosecution of an Indian. It did so on the basis of the *Toscanino* exception to the *Ker-Frisbie* rule.

7. Extradition between nations is based on the notion of comity. Extradition rights exist only when created by treaty; in the United States, by Act of Congress pursuant to U.S.Const. art. II, § 2. The Constitution makes extradition treaties a part of the Supreme Law of the Land, *id.* art. VI, § 2, and as such their construction is for the courts.

8. Rendition between states, on the other hand, is founded on article IV, § 2 of the Constitution and effectuating federal statutes. It is not based on comity, nor is it governed by the same principles as extradition. *Biddinger v. New York City Police Comm'r*, 245 U.S. 128, 132–33, 38 S.Ct. 41, 42–43, 62 L.Ed. 193 (1917). Rendition being a federal matter, federal law preempts any conflicting state legislation. *Cf. Ross v. Middlebrooks*, 188 F.2d 308 (9th Cir.), cert. denied, 342 U.S. 862, 72 S.Ct. 90, 96 L.Ed. 649 (1951); *Ex parte Arrington*, 270 S.W.2d 39, 42 (Mo. banc 1954).

9. In *Bennally v. Marcum*, an enrolled member of the Navajo tribe committed traffic offenses in a nearby city. Although he was followed directly to the reservation and arrested, the fresh pursuit doctrine was inapplicable because the offenses were only misdemeanors, not felonies. The Supreme Court of New Mexico granted a writ of prohibition preventing the municipal court from proceeding in the case. Following *Arizona ex rel. Merrill v. Turtle*, the state Supreme Court stressed that the tribal extradition procedures had been codified and approved by the federal government. And, like the Ninth Circuit, it granted relief to the Indian accused prior to the state trial. However, *Arizona ex rel. Merrill v. Turtle* is inapposite to the *Ker-Frisbie* issue because there the challenge was to a proposed extradition, whereas here the demanding jurisdiction already has custody of the defendant.

In *Weddell v. Meierhenry*, 636 F.2d 211 (8th Cir. 1980), a panel of this court tersely refused to extend the *Toscanino* exception to a habeas corpus petition by a reservation Indian. *Weddell v. Meierhenry* could be easily distinguished from the case at hand. For example, that arrest was by a BIA officer acting pursuant to arrest authority in Indian country, not by state officials; the arrest was after an armed siege, not at a voluntary meeting; and the habeas corpus petition was filed two and one-half years after conviction, not before trial. Most importantly, in *Weddell v. Meierhenry*, the tribe was not before the court and no tribal interests were asserted, whereas here the tribe filed as amicus and appeared before the court. Therefore, that case is consistent with my result. Furthermore, I agree with the majority that it is neither appropriate nor necessary to extend *Toscanino* to the situation before us. Rather, my conclusion is grounded in the concept of federal preemption.

I begin my discussion of Indian law mindful of the following admonition from the American Indian Policy Review Commission:

This Commission's charter from Congress, reflecting 200 years of legislative and executive actions, aptly describes the relationship between the United States and American Indian tribes as "unique" and "special." Such words have repeatedly been emphasized by the United States Supreme Court in opinions stretching across almost 1½ centuries. Thus the unequivocal message from all three branches of our Federal Government is that Indian laws and policy is a field into itself.

It is almost always a mistake to seek answers to Indian legal issues by making analogies to seemingly similar fields. General notions of civil rights law and public land law, for example, simply fail to resolve many questions relating to American Indian tribes and individuals. The extraordinary body of law and policy holds its own answers, which are often wholly unexpected to those unfamiliar with it.

Final Report, *supra*, at 99 (footnotes omitted).

Congress has plenary power over the Indian tribes, not under the treaty making power or the extradition clause, but under the Indian commerce clause. U.S.Const. art. I, § 8, cl. 3. Congress had endorsed a policy of terminating all reservations and integrating individual Indians into the general population. But, by 1957, Congress repudiated its termination policy in favor of strengthening tribal government.

In 1959, the Supreme Court rejected territoriality [10] as a basis for Indian law and invented to replace it the so-called "infringement test." The still-applicable rule was formulated as follows: "Absent governing acts of Congress, the question [of jurisdiction] has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220, 79 S.Ct. 269, 270–271, 3 L.Ed.2d 251 (1959).

Although the first phrase of the infringement test raised the possibility of federal preemption, early cases under *Williams v. Lee* concentrated on the infringement test, which was a sort of subject matter jurisdiction. That is, the court looked to the activity involved and made a case-by-case determination of its effect on tribal government. *E. g., Organized Village of Kake v. Egan*, 369 U.S. 60, 75–76, 82 S.Ct. 562, 570–571, 7 L.Ed.2d 573 (1962). The infringement test created a presumption against state power.[11]

---

**10.** Territoriality was the basis for *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). Territoriality is the strongest type of sovereignty, but the Supreme Court has since declared that the reservation cannot be reinstated as a territorial sovereign. *De Coteau v.* *District Court*, 420 U.S. 425, 444–46, 95 S.Ct. 1082, 1092–1094, 43 L.Ed.2d 300 (1975).

**11.** For a criticism of the Supreme Court's handling of Indian affairs, see Barsh, *The Omen: Three Affiliated Tribes v. Moe and the Future of Tribal Self-Government*, 5 Am.Indian L.Rev.

It is instructive to place the immunity of Indian tribes from State jurisdiction in historical perspective. Since *Williams v. Lee* was handed down in 1958 [sic] . . . the Court has never upheld any asserted State jurisdiction over Indians in Indian Country. Indeed, in its long history, the Supreme Court has never, absent express congressional authority, permitted any State to assume any jurisdiction whatsoever over Indians in Indian Country.

Final Report, *supra*, at 119.

Pursuant to § 476 [12] of the Indian Reorganization Act, 25 U.S.C. §§ 461–79 (1934), most tribes adopted constitutions, which were then ratified by the Secretary of the Interior. *See* U.S. Dep't of Interior, Federal Indian Law 409 n.29 (Oceana Reprint 1906). The tribes thus entered into a new era of self-government with only the federal government as a superior power. Therefore, the infringement test applied to increasingly fewer cases. "The question [of inherent tribal sovereignty as a bar to state jurisdiction] is generally of little more than theoretical importance, however, since in almost all cases, federal treaties and statutes define the boundaries of federal and state jurisdiction." *McClanahan v. Arizona State Tax Comm'n, supra*, 411 U.S. at 172 n.8, 93 S.Ct. at 1262 n.8, *rev'g* 14 Ariz.App.

452, 484 P.2d 221 (1971). The federal preemption part of the *Williams v. Lee* rule had come to overshadow the infringement test.

In Indian affairs, there are two separate chains of authority. Final Report, *supra*, at 119. One chain consists of the federal and tribal governments. The other chain consists of state, county and local governments. The relationship of the state and the tribe is a question of fact in each case. *See Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); *McClanahan v. Arizona State Tax Comm'n, supra*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129. Although federal law, not state law, is preeminent in Indian country, the tribes are not federal instrumentalities for substantive law purposes. *Moe v. Confederated Salish & Kootenai Tribes, supra*, 425 U.S. at 471, 96 S.Ct. at 1640; *Mescalero Apache Tribe v. Jones, supra*, 411 U.S. at 154, 93 S.Ct. at 1273. If they were, their activities would be limited to federal objectives. Treaties between the federal government and tribes are not, however, grants of power by the United States to the tribes, but rather grants of power from the tribes to the United States. Final Report, *supra*, at 95. The tribes retain all powers not specifically limited. Therefore, not only can the

1 (1977). Barsh charges that the Supreme Court has involuted the infringement test, allowing the state to extend its jurisdiction to the reservation and even to take away rights expressly granted to the tribe by the federal government so long as there was no "infringement." But see text discussion of preemption analysis. *Infra*, pp. 532–533.

12. § 476. Organization of Indian tribes; constitution and by-laws; special election

Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, which shall become effective when ratified by a majority vote of the adult members of the tribe, or of the adult Indians residing on such reservation, as the case may be, at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe. Such constitution and bylaws, when ratified as aforesaid and approved by the Secretary of the Interior, shall be revocable by an election open to the same voters and conducted in the

same manner as hereinabove provided. Amendments to the constitution and bylaws may be ratified and approved by the Secretary in the same manner as the original constitution and bylaws.

In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: To employ legal counsel, the choice of counsel and fixing of fees to be subject to the approval of the Secretary of the Interior; to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State, and local Governments. The Secretary of the Interior shall advise such tribe or its tribal council of all appropriation estimates or Federal projects for the benefit of the tribe prior to the submission of such estimates to the Bureau of the Budget and the Congress. June 18, 1934, c. 576, § 16, 48 Stat. 987.

United States *delegate* some of its authority to regulate the affairs of Indians to tribes, but also the tribes *retain* inherent sovereignty over matters that affect the internal and social relations of tribal life. *United States v. Mazurie, supra*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706; Final Report, *supra*, at 119.

In *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), the Supreme Court reaffirmed the principles of *Williams v. Lee* and *McClanahan*. Although the justices reached different conclusions on imposition of a state tax on cigarette sales on the reservation, all four opinions in *Confederated Tribes* recognized federal preemption. In the majority opinion, Justice White stated: "[T]ribal sovereignty is dependent on and subordinate to only the Federal Government, not the States." *Id.* 100 S.Ct. at 2081. Justice Brennan, dissenting in part, stated: "The prevalent mode of analysis is one of preemption. It takes as its starting point the exclusive power of the Federal Government to regulate Indian tribes and proceeds to bound state power where necessary to give vitality to the federal concerns at stake." *Id.* 100 S.Ct. at 2088. Justice Stewart, dissenting in part, reached his conclusion on the basis of effectuating federal policies. *Id.* 100 S.Ct. at 2092–93.

And, most significantly, Justice Rehnquist, who had written *Mazurie* and *Moe*, concurring and dissenting, wrote:

Since early in the last century, this Court has been struggling to develop a coherent doctrine by which to measure with some predictability the scope of Indian immunity from state taxation. In recent years, it appeared that such a doctrine was well on its way to being established. I write separately to underscore what I think the contours of that doctrine are because I am convinced that a well-defined body of principles is essential in

order to end the need for case-by-case litigation which has plagued this area of the law for a number of years. That doctrine, I had thought, was at bottom a pre-emption analysis based on the principle that Indian immunities are dependent upon congressional intent, at least absent discriminatory state action prohibited by the Indian Commerce Clause. I see no need for this Court to balance the state and tribal interests in enacting particular forms of taxation in order to determine their validity. Absent discrimination, the question is only one of congressional intent. Either Congress intended to pre-empt the state taxing authority or it did not. Balancing of interests is not the appropriate gauge for determining validity since it is that very balancing which we have reserved to Congress.

*Id.* 100 S.Ct. at 2093 (footnote and citations omitted). Justice Rehnquist then proceeded to discuss the role of tribal sovereignty in federal preemption. The result was a two-step analysis. First, the Court reviews the "tradition of sovereignty" regarding the activity in question. *Id.* 100 S.Ct. at 2094. Second, the Court undertakes "a review of the relevant treaties and statutes to determine whether this tradition of immunity had been altered by Congress." *Id.* (footnote omitted). If there is a tradition of sovereignty, the Court will not infer a departure from that unless Congress has expressly abolished that sovereign power. *Id.*, citing *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112–2113, 48 L.Ed.2d 710 (1976). Conversely, if there is no tradition of sovereignty, the Court will not recognize a sovereign power unless Congress has expressly conferred one. *Id.*, citing *Mescalero Apache Tribe v. Jones, supra*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114.

Applying those principles, then, our task should not be to analogize from extradition law in a vain attempt to make the federal-tribe-state relationship fit that mold.[13] Nor

---

13. Courts have sometimes reached the desired result by claiming that the Indian tribes were being "treated as domestic, dependent nations with whom the [United States] could make

treaties as with a foreign nation." *Ex parte Morgan*, 20 F. 298, 306 (W.D.Ark.1883). There, an arrest warrant that the Arkansas governor issued to honor an extradition demand of the

should we balance the state's interest against the tribe's interest. Rather we should apply Justice Rehnquist's two-step analysis to determine whether there is a tradition of tribal sovereignty which, unless expressly abolished by Congress, is retained by the tribe. This analysis is appropriate to an extradition problem, because an extradition treaty creates rights only as to the sovereigns and only one sovereign's objection can affect the other sovereign's jurisdiction over a fugitive. Here, the tribe as a sovereign objects to the state court's jurisdiction over Davis.

Initially, I would look at the "tradition of sovereignty" regarding tribal courts.[14] The Eighth Circuit has long held that tribal courts are not federal creations or delegations of federal power, but rather are products of *inherent* tribal sovereignty. *United States v. Elk*, 561 F.2d 133, 135 (8th Cir. 1977); *United States v. Walking Crow*, 560 F.2d 386, 388 (8th Cir. 1977), *cert. denied*, 435 U.S. 953, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978); *Iron Crow v. Oglala Sioux Tribe*, 231 F.2d 89, 94 (8th Cir. 1956). This conclusion was also reached in other circuits, *e. g.*, *Tom v. Sutton*, 533 F.2d 1101, 1103 (9th Cir. 1976), and has been confirmed by the Supreme Court. *United States v. Wheeler*, 435 U.S. 313, 328 n.28, 98 S.Ct. 1079, 1089 n.28, 55 L.Ed.2d 303 (1978). Tribal courts

have full jurisdiction over Indians on the reservation to the extent that such jurisdiction is not inconsistent with federal enactments.[15] *Quechan Tribe of Indians v. Rowe*, 531 F.2d 408, 411 n.4 (9th Cir. 1976). Therefore, Indian tribes, including the Turtle Mountain Band, retain inherent sovereign power to establish court systems with jurisdiction over tribal members.[16] *Compare Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 208–09, 98 S.Ct. 1011, 1020–1021, 55 L.Ed.2d 209 (1978) (no tradition of criminal jurisdiction over non-Indians).

Next I would look to see whether the tradition of sovereignty regarding Indian courts has been altered by Congress. Clearly, Congress has not abolished the Indian tribes' sovereign power to establish court systems. On the contrary, federal statutes and rules promulgated thereunder support the authority of the tribal courts.[17] Section 476 of the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.*, recognized all existing rights of Indian tribes and also encouraged tribes to adopt constitutions and bylaws, which would then be approved by federal authorities. One tribal power recognized by courts is the authority of tribal courts to transfer those who violate state or federal laws to state or federal officials. *See Quechan Tribe of Indians v. Rowe, supra*, 531 F.2d at 411 (hunting viola-

---

Cherokee chief was held void because neither was the chief a federal official who could act under the extradition treaty nor was Indian country a state or a territory for rendition purposes. Other courts have attempted to apply a federal-state analogy. *E. g., Colliflower v. Garland*, 342 F.2d 369, 376–79 (9th Cir. 1965) (tribal court is not of state or separate sovereign but is a federal agency), *overruled in United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (tribal court is not a federal agency but has concurrent jurisdiction, like a state court). *See* Robertson, *supra* note 13, 6 Am.Indian L.Rev. at 392–93 arguing that state sovereignty doctrine should be applied to tribes. Neither analogy is trenchant in tribal extradition cases for the simple reason that no foreign nation is located within any state of the United States or is subject to complete defeasance at the whim of the United States.

14. Tribal sovereignty doctrine has been criticized as "so vague that any specific powers of self-government which remain vested in the tribes cannot be objectively determined in ad-

vance of a pronouncement by the Court." Robertson, *supra* note 13, 6 Am.Indian L.Rev. at 373.

15. The Major Crimes Act, 18 U.S.C. § 1153, preempts both state and tribal jurisdiction over enumerated crimes when committed by Indians in Indian country. *United States v. John*, 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978).

16. Nor is this power "inconsistent with their status" as limited sovereigns subordinate to the United States. Our federal form of government provides numerous examples of limited sovereigns exercising concurrent jurisdiction over the same territory and people. Note, *Indian Rights—What's Left?*, 41 U.Pitt.L.Rev. 75, 84 (1979).

17. This is not a case of delegation, although if it were I would reach the same result because Congress would have expressly conferred the power.

tion by non-Indians). Where the state and the tribe might otherwise have concurrent jurisdiction, the state's jurisdiction is totally preempted by federal policy and legislation, and the state cannot exercise jurisdiction unless Congress expressly grants it. *See Fisher v. District Court, supra,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (adoption proceedings); *Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655 (9th Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977) (land use ordinances), *citing* Indian Reorganization Act, 25 U.S.C. § 461 *et seq., and* Indian Civil Rights Act of 1968, 25 U.S.C. § 1301 *et seq.*

The Turtle Mountain Band adopted a Constitution and Bylaws in 1959, which were approved by the Commissioner of the Interior and the Assistant Secretary of the Interior. Pursuant to the authority vested in it by article IX of that Constitution, the Tribal Council enacted the Turtle Mountain Tribal Code of 1976, of which § 1.0710–.0713 governs arrest and extradition of reservation Indians to state authorities. There is no applicable federal statute conferring jurisdiction over these matters on the state.

In summary, the Turtle Mountain Band has a tradition of sovereignty which includes the power to establish a court system with full jurisdiction over its members, except where abrogated by Congress. One function of the tribe's court system is its control of the arrest and extradition of tribal members. This function has not been abrogated by Congress. On the contrary, this function is consistent with Congressional intent as shown in federal statutes implementing tribal self-government. Under these circumstances, there is a presumption against state jurisdiction, which could have been overcome only by a federal enactment explicitly granting jurisdiction to the state. There is no such enactment here. State jurisdiction over Indian offenders on the reservation is preempted by the legislation and policy of the federal government, with its exclusive power to regulate Indian affairs.

The *Ker-Frisbie* doctrine that a court maintains personal jurisdiction over a defendant despite any illegality in the arrest is based on the rationale that a fugitive has no right of asylum. The *Ker-Frisbie* doctrine is, however, inapplicable to a state's violation of the tribal extradition ordinance. The state cannot exercise jurisdiction over the Indian fugitive, not because of a violation of the Indian fugitive's individual rights, but because of Congressional intent that the state recognize tribal sovereignty by complying with the tribal extradition ordinance. Where Congress has expressed its intention regarding the affairs of Indians, over which it has plenary authority, it is not for the courts to attempt to balance state interests against tribal interests. There is a federal policy of encouraging Indian self-government. State violation of tribal extradition ordinances impedes tribal self-government. Therefore, in my opinion, the state court should not be allowed to maintain jurisdiction over Davis until the Rolette County officials comply with the Turtle Mountain tribal extradition ordinance.