DESJARLAIS, Plaintiff in error, v. STATE, Defendant in error.†

*No. 75–334–CR. Argued June 3, 1976.—Decided June 30, 1976.*
(Also reported in 243 N. W. 2d 453.)

† Motion for rehearing denied, without costs, on August 23, 1976.

For the plaintiff in error there was a brief by *Howard B. Eisenberg*, state public defender, and *Jack E. Schairer*, assistant state public defender, and oral argument by *Mr. Schairer*.

For the defendant in error the cause was argued by *Betty R. Brown*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

HANLEY, J. Following issues are presented on appeal:

1. Was the arrest of the defendant rendered invalid by a lack of conformity to the Uniform Criminal Extradition Act?

2. Was the arrest of the defendant invalid under Minnesota law?

3. Was the search of the vehicle occupied by the defendant illegal so as to require suppression of its fruits?

4. Did the police conduct a lineup violative of the defendant's right to counsel?

5. Was the defendant denied due process in that the jury panel allegedly reflected intentional and systematic exclusion of American Indians?

6. Did the trial court improperly restrict the cross-examination of Mrs. LaFromboise on the topic of drug use?

7. Was an abuse of discretion committed by the sentence imposed on this defendant?

*Unform Criminal Extradition Act.*

The arguments concerning the validity of the defendant's arrest are rather unclear. The brief makes intermittent reference to the Uniform Criminal Extradition Act. One caption refers to the lack of an outstanding warrant in Wisconsin at the point of arrest, while the text dwells on further procedural aspects of interstate law enforcement.

Both Wisconsin and Minnesota have enacted the Uniform Criminal Extradition Act, a key portion of which provides:

"ARREST WITHOUT A WARRANT. The arrest of a person may be lawfully made also by an officer or a private citizen without a warrant upon reasonable information that the accused stands charged in the courts of another state with a crime punishable by death or imprisonment for a term exceeding one year; but when so arrested the accused must be taken before a judge *with all practicable speed* and complaint must be made against him under oath setting forth the ground for the arrest as in sub. (13); and thereafter his answer shall be heard as if he had been arrested on a warrant." (Emphasis supplied.) Sec. 976.03 (14), Stats.; sec. 629.14, 1971 Minn. Stats.

Read in conjunction with preceding and following portions, the section clearly deals with arrest in the asylum state and the necessity of a complaint subsequently filed there to hold the fugitive for extradition.

*See:* sec. 976.03 (13), Stats., where the complaint is made and warrant issued in the asylum state prior to arrest. Although the language of the statute implies the necessity of some prior court action in the state where the crime was committed, this court has recognized that the enabling procedure of the Uniform Act was not intended to repudiate the common-law rule that an arrest may be made on probable cause to believe the subject had committed a crime in another state irrespective of a lack of complaint or warrant in that state. In *State v. Klein* (1964), 25 Wis. 2d 394, 130 N. W. 2d 816, certiorari denied, 380 U. S. 951, 85 Sup. Ct. 1083, 13 L. Ed. 2d 969, the complaint and warrant were similarly not filed and issued in Wisconsin prior to an arrest in Michigan. The arrest here cannot be called invalid because of the lack of a prior Wisconsin complaint.

Attention should be directed to the question of subsequent conformance to the provisions of the Uniform Act. As recently discussed in *State v. Hughes* (1975), 68 Wis. 2d 662, 229 N. W. 2d 655, the prearrest "complaint" of sec. 976.03 (13), Stats., and the postarrest "complaint" of sec. 976.03 (14) and their Minnesota counterparts all have the purpose of securing a warrant for the further detention of the fugitive until extradition can be made. The fugitive is taken to a magistrate so that the official may verify that the person in custody is the person charged with the foreign crime and alleged to have fled the state of its commission.

To insure performance of this verification, the arresting officers are required to bring the fugitive before a magistrate "with all practicable speed." Defendant complains here because the officers took him to the Winona police station and held him for an identification showup later that evening. Apparently the defendant interprets the language of the Uniform Act to mean "instantaneous." This argument is rejected by *State v. Hughes,*

*supra,* where the time element was equated with the reasonable amount of time under the facts and circumstances of the particular case. Very often complicated and slower procedures are necessary to gather the facts and documents from other states for a fugitive warrant proceeding than would be required on intrastate criminal proceedings. Desjarlais was arrested late in the evening and there was no abrogation of the Uniform Act by a showup a short time thereafter.

The record is unclear as to whether a fugitive complaint hearing was held in Minnesota. It is possible that the Minnesota authorities may have merely turned the defendants over to La Crosse police the next day when the Wisconsin complaint was filed. However, there is a document in the record which would indicate that the initial appearance was not held in Wisconsin until March 16, 1973. It is possible that the defendant was held in Minnesota until that time for Uniform Act extradition proceedings.

Appellate counsel for Desjarlais has tried to capitalize on this ambiguity by reference merely to the time gap. No verification of harmful or harmless causes of the delay is provided, the issue not being raised before trial by appointed trial counsel nor being asserted by posttrial motion. A chance to make a record of facts connected with the delay was waived.

It is the burden of the defendant to produce facts showing that he was not expeditiously brought before a magistrate. The state does not assume the initial burden of showing that the period of detention was not unreasonable, *Pinczkowski v. State* (1971), 51 Wis. 2d 249, 253, 186 N. W. 2d 203, especially where the facts of the time and place of custody are not shown on the appellate record.

■ Even if some of the purported deficiencies were shown at this time, they would not invalidate the con-

viction here. The law is well settled that an illegal arrest or detention does not automatically void a subsequent conviction. *Gerstein v. Pugh* (1975), 420 U. S. 103, 119, 95 Sup. Ct. 854, 43 L. Ed. 2d 54. Invalidity of arrest is mainly asserted in reference to suppression of evidence seized only pursuant to such arrest, but some assertions of arrest invalidity (as well as assertions of other procedural errors) are raised only to challenge the present confinement of the accused. The alleged deficiency to compliance with the Uniform Act and/or the alleged delay in the initial appearance are both "defects in the institution of the proceedings," sec. 971.31 (2), Stats., as is the more specific defect of an invalid arrest. These errors statutorily must be raised before trial by motion or be deemed waived. Section 971.31, formalizes the procedure of raising, for example, the personal jurisdiction deficiency of an illegal arrest, *Lampkins v. State* (1971), 51 Wis. 2d 564, 187 N. W. 2d 164; *see also: Gaertner v. State* (1967), 35 Wis. 2d 159, 150 N. W. 2d 370, a defect which could be waived under the case law if not timely raised, *State ex rel. La Follette v. Raskin* (1966), 30 Wis. 2d 39, 139 N. W. 2d 667.

No attempt was made to raise the above deficiencies before trial, perhaps because the remedy for such errors would merely be the reinstitution of proceedings upon the defendant's release. The issue of an invalid arrest through a lack of probable cause was the only one raised by motion and thus preserved for appeal. Some reference is made to a lack of counsel at a point where a challenge could be made, but it appears that counsel was appointed for the defendants and had ample time to undertake those specific challenges that must be made before a preliminary examination, sec. 971.31 (5) (c), Stats., or within ten days of the arraignment, sec. 971.31 (5) (a). Appropriate challenges affecting the substance of the prosecution were made. Apparently

the trial court addressed the application of the Uniform Act in pretrial motions simply because the state supplied argument on it in reference to the validity of the Minnesota arrest on "probable cause" without the necessity of a Wisconsin complaint or warrant. The provisions of the Uniform Criminal Extradition Act did not affect the validity of the arrest.

*Probable cause for arrest.*

 The validity of the arrest, specifically in regard to the authority of the officer to make such an arrest, is to be determined by the law of the state where the arrest occurred, *Kluck v. State* (1967), 37 Wis. 2d 378, 389, 155 N. W. 2d 26; *State v. Klein, supra,* at 398, here Minnesota. Minnesota officers may arrest without a warrant upon possessing probable cause to believe a felony has been committed by the subject. *State v. Klein, supra,* is authority in this state for assuming that the officer's arrest power embraces the common-law power to arrest even if the felony was committed in another jurisdiction.

 "Probable cause" under Minnesota standards equates with that demanded by the Fourth Amendment, *State v. Purdy* (1967), 278 Minn. 133, 153 N. W. 2d 254, which is the same standard required in this state, *Browne v. State* (1964), 24 Wis. 2d 491, 503, 129 N. W. 2d 175, 131 N. W. 2d 169, certiorari denied 379 U. S. 1004, 85 Sup. Ct. 730, 13 L. Ed. 2d 706. On the question of probable cause, this court has often approved the proposition that a police force is considered as a unit; where there is police-channel communication to the arresting officer who acts in good faith on such communication, his arrest is valid if probable cause is shown by the facts possessed by the department which were summarized in police dispatches. *State v. Taylor* (1973), 60 Wis. 2d 506, 515, 210 N. W. 2d 873; *State v. Shears*

(1975), 68 Wis. 2d 217, 253, 229 N. W. 2d 103. In *State v. Klein, supra,* at 400, this court held that when an officer makes a nonwarrant arrest at the request of another police agency, all reasonable doubt concerning the reasonableness of the information on which he acts should be resolved in his favor. Minnesota has also accepted these approaches. *State v. Stark* (1970), 288 Minn. 286, 179 N. W. 2d 597, certiorari denied (1971), 402 U. S. 930, 91 Sup. Ct. 1529, 28 L. Ed. 2d 864.

■ Equally applicable is the concept that law enforcement officers may temporarily detain citizens for the purpose of obtaining information about them on their activities. Implicitly raised in *Terry v. Ohio* (1968), 392 U. S. 1, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889 and confirmed in *Adams v. Williams* (1972), 407 U. S. 143, 92 Sup. Ct. 1921, 32 L. Ed. 2d 612, this theory was accepted in Wisconsin in *State v. Chambers* (1972), 55 Wis. 2d 289, 198 N. W. 2d 377. Minnesota recognized the reasonableness of the investigative stop even before *Terry* and *Adams.* In *State v. Clifford* (1966), 273 Minn. 249, 141 N. W. 2d 124, police officers were justified in making such a stop of a vehicle circling a business establishment in the early hours of the morning. An automobile stop and the use of unholstered weapons was not seen by this court as transforming the investigatory stop into an arrest if those factors are reasonable under the circumstances. *Jones v. State* (1975), 70 Wis. 2d 62, 233 N. W. 2d 441.

Applying the above rules of law to the facts here, it is apparent that no improper activity occurred in either the arrest or search.

At 9:40 p.m., a little more than an hour after the stickup, patrolman William Trautner of the Minnesota State Highway Patrol received a radio dispatch report of the La Crosse robbery. A description of the vehicle, including the conflicting possible colors of maroon or

green, and the description of two of its three occupants was given. In the course of his patrol of the border near La Crosse, Trautner checked vehicles against the description.

Less than a half hour after the report, Trautner observed a vehicle traveling away from the La Crosse area in the opposite lane of the divided highway. Trautner testified to his familiarity with silhouettes and headlight arrangements of American cars and he believed the vehicle to be a Chevrolet of the vintage of the suspect vehicle. Nearby lights revealed its dark color.

After crossing the highway, Trautner caught up to the vehicle. It was a green, 1970 Chevrolet Chevelle, apparently containing three occupants. He continued to follow the car while radioing for backup assistance from policemen of Winona, Minnesota, which town the cars were approaching. He then decided to get another look at the Chevelle and its occupants, approaching with his high beam headlights and a spotlight on. The Chevelle pulled over and Trautner followed. Although he testified that he did not want to stop the car until he had the assistance of other officers, Trautner cautiously approached the car. A woman identified as Mrs. LaFromboise was in the driver's seat and she informed the patrolman that she did not have a license. One of the defendants identified the vehicle as being registered to his girl friend. Trautner told them to wait there and he then returned to his patrol car.

While back at the car, Trautner again called for backup assistance. Winona officers arrived almost immediately and he informed them that he believed he had stopped the La Crosse armed robbery suspects. With weapons drawn, the officers approached the car, ordered the occupants out and patted them down for weapons. None were found. Although the height and weight descriptions given for each defendant by Duxbury were

slightly in error on the side of more height and weight, the proportions between the two were consistent. The other characteristics matched.

█ It is clear that Trautner intended to stop the vehicle eventually and it is further clear that he had a sufficient view of it by that point to justify a stop to investigate further correlation with the radio broadcast of the armed robbery suspects. Counsel for Desjarlais, in asserting that there was no probable cause at the point of the stop to believe that the Chevelle occupants had committed a crime, ignores the developed laws of both Minnesota and Wisconsin which allow stops to investigate the further details which might confirm or deny probable cause. Upon discovering that the two male occupants met the description of the suspects, Trautner obviously retreated for assistance and to allow the local enforcement officers to handle the situation.

*Vehicle search.*

At that point one of the officers searched the interior of the vehicle, finding no incriminating evidence. Then the car keys were procured and the trunk opened. A purse was found containing numerous wrapped rolls of coins. The defendants and Mrs. LaFromboise were placed under arrest. Although there was some testimony as to consent for these searches, the trial court declined to find that it had been given when no corroboration was produced from potential witnesses.

An examination into the validity of the search could justifiably proceed from the obvious conclusion that there was probable cause to arrest before any officer even entered the vehicle. As Mr. Justice HARLAN wrote in his concurring opinion in *Sibron v. New York* (1968), 392 U. S. 40, 77, 88 Sup. Ct. 1889, 20 L. Ed. 2d 917:

"There is *no* case in which a defendant may validly say, 'Although the officer had a right to arrest me at

the moment when he seized me and searched my person, the search is invalid because he did not in fact arrest me until afterwards.' " (Emphasis in original.)

*See also: Cupp v. Murphy* (1973), 412 U. S. 291, 93 Sup. Ct. 2000, 36 L. Ed. 2d 900, where four courts, including the United States Supreme Court, found that the existence of probable cause to arrest validated a search and seizure of physical evidence without the actual interposition of an arrest.

The trial court here concentrated on the independent but frequently concurring basis of probable cause to search the vehicle itself under exigent circumstances excusing the lack of a warrant.

This doctrine can be traced from the early case of *Carroll v. United States* (1925), 267 U. S. 132, 45 Sup. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790, where there was probable cause to believe that items offensive to the law were contained in a vehicle in transit, the mobility being an exigency excusing the nonwarrant temporary seizure and search. The later case of *Scher v. United States* (1938), 305 U. S. 251, 59 Sup. Ct. 174, 83 L. Ed. 151, confirmed that the potential mobility of a parked, unoccupied vehicle similarly qualified it for a search without a warrant.

The general ruling in *Carroll* was followed in *Chambers v. Maroney* (1970), 399 U. S. 42, 90 Sup. Ct. 1975, 26 L. Ed. 2d 419. The United States Supreme Court stated that the rule of *Carroll* is that:

". . . a search warrant [is] unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible." 399 U. S. at page 51.

The instant case and *Chambers v. Maroney, supra,* are quite similar. There, about an hour after an armed

robbery and after they heard a police radio dispatch describing the car involved and its occupants, two officers stopped such a car. Instead of searching the car on the spot, as in the instant case, the police immediately arrested the occupants and drove the car to the police station. It was there searched without a warrant and guns and fruits of the crime were seized. The United States Supreme Court upheld the validity of the delayed search and in so doing stated that the present search is a valid one. It stated:

"On the facts before us, the blue station wagon could have been searched on the spot when it was stopped since there was probable cause to search and it was a fleeting target for a search. . . ." 399 U. S. at page 52.

Here, the Minnesota police officers had probable cause to search the Chevelle car for a gun and for money, since that car fit the description of the car used in the robbery and two of its occupants fit the description of the two robbers.

*Chambers* was recognized by this court in *State v. Russell* (1973), 60 Wis. 2d 712, 211 N. W. 2d 637. Patrolling officers received a radio broadcast of an armed robbery of a tavern by three dark-clothed black men, one wearing a red floppy hat. A car containing such suspects was stopped, and they were arrested on the finding of a concealed revolver and placed in a squad car. Other weapons and a bag of money were found after the arrests in a vehicle search by the officers. This court stated:

"Under these facts, to require that an officer remain with the car (this is at 12:45 a.m.) until a search warrant could be obtained, or otherwise impound the car and then obtain a search warrant, appears to be an illogical and unnecessary imposition of form over substance. The search of the vehicle in this case was based upon facts known to the officer which would lead any

reasonable police officer to believe that it was not only probable, but highly probable, that the fruits of the crime were near at hand." *Id.* at page 718.

Minnesota has recognized the pertinent decisions of the United States Supreme Court on the interpretation of the Fourth Amendment. Citing *Preston v. United States* (1964), 376 U. S. 364, 84 Sup. Ct. 881, 11 L. Ed. 2d 777, and *Chimel v. California* (1969), 395 U. S. 752, 89 Sup. Ct. 2034, 23 L. Ed. 2d 685, the court in *St. Paul v. Johnson* (1970), 288 Minn. 519, 179 N. W. 2d 317, approved a vehicle search incident to a weapon violation arrest even though conducted after subjects were placed in a squad car.

In *State v. Kohuth* (1970), 287 Minn. 520, 176 N. W. 2d 872, we have a case very similar to the present situa-tion. As here, the defendant committed an armed robbery and fled in an automobile. His victim gave a description of his car, including a license number. Shortly thereafter the police spotted the car in front of a restaurant. They checked in the restaurant, returned to the car and searched it. A gun was found in the glove compartment. The defendant was then arrested and searched. $60 was found on his person, which was the approximate amount of money taken in the robbery. Defendant was tried and convicted. On appeal he claimed that the gun, which had been admitted into evidence at his trial, was the product of an unlawful search and seizure. The Minnesota Supreme Court held that under the circumstances of the case the car was an instrumentality of the crime and that "the search was reasonable and hence the gun was admissible." *Id.* at 176 N. W. 2d 874.

██ We think the search of the trunk of the Chevelle and the seizure of the rolls of coins was a reasonable search and seizure. The search and seizure did not violate any constitutional rights of the defendant because

the police did have probable cause to search the car for a gun and stolen money.

*Police lineup.*

After the vehicle search the three occupants were conveyed to the Winona police station. Word of their arrest was sent to La Crosse and the victim was summoned at eleven o'clock that evening to come and view the subjects. He entered a room where Derouin and Mrs. LaFromboise were sitting with a policewoman and affirmed to officers that Derouin had been involved in the holdup. He then went to view Desjarlais. The defendant testified that at about midnight he was taken from a cell by two officers and led to another room. Duxbury and other officers approached this room at the same time from another direction. Desjarlais, in jeans and turtleneck and carrying his dark jacket, was then seated in the room. He was not handcuffed. There were both uniformed and plainclothed officers milling about in this area. Duxbury walked out of the room and informed the officers that Desjarlais was the other robber. No attempt was made to direct his attention to the defendant, but Duxbury was aware that he was being taken to view suspects.

Desjarlais argues that this confrontation was in violation of his right to counsel at a lineup proceeding. Acknowledging that such right does not extend to the period before formal charges are filed, *State v. Taylor* (1973), 60 Wis. 2d 506, 210 N. W. 2d 873, adopting the rule of *Kirby v. Illinois* (1972), 406 U. S. 682, 92 Sup. Ct. 1877, 32 L. Ed. 2d 411, he alleges that the formal complaint under the Uniform Criminal Extradition Act was delayed to avoid the counsel requirement. There is no basis in the record to support such a claim.

In *State v. Russell, supra,* this court held that the counsel requirement of *State v. Taylor, supra,* did not

apply to the investigatory identification of three vehicle occupants by the victim of their armed robbery only a few hours after the incident and after their arrest based on a police radio description.

*State v. Russell, supra,* additionally held that counsel was not required for nonlineup identifications. One-to-one confrontations, chance observations and un-staged one-out-of-a-crowd identifications have been held by this court to fall beyond the counsel requirement in the absence of a specific ruling on the question by the United States Supreme Court. *Johnson v. State* (1970), 47 Wis. 2d 13, 176 N. W. 2d 232; *State v. DiMaggio* (1971), 49 Wis. 2d 565, 182 N. W. 2d 466. When the witness, as here, is really viewing only one suspect in the obvious presence of other police officers, the proceeding is aptly called a "showup" rather than a lineup.

*Jury challenge.*

Just prior to trial defendant filed a motion challenging the jury array on the basis of intentional and systematic exclusion of American Indians. He is a full-blooded member of that class, while his codefendant was of a mixed ethnic origin that included Native Americans. In support of the motion, trial counsel submitted census figures for La Crosse county that revealed 128 persons of American Indian origin out of a total population of 80,468 persons, that being a segment of slightly more than one-tenth of one percent of the community.

In support of its challenge, the defense called the La Crosse county jury commissioners. Their testimony established that the jury panel was derived from responses to questionnaires that do not refer to race or ethnic background. These surveys were mailed mainly to those persons on voting lists, but there was also testimony that names were obtained from the city telephone directory and from personal contacts. None of the com-

missioners were personally acquainted with any American Indian residents of La Crosse county, but felt that their chances for jury duty were "about the same as" any other resident.

The questionnaire in use contains no request for information on race, ethnic background or ancestry. Indians are not excluded as prospective jurors. If they are on a voting list, they get the same questionnaires as anyone else. There was no evidence that the Native American population of La Crosse county does not participate in the electoral process.

 Total absence of representation, which has not been shown here, certainly raises no showing of systematic and intentional exclusion when the affected class composes much less than one percent of the population. As stated in *Brown v. State* (1973), 58 Wis. 2d 158, 165, 166, 205 N. W. 2d 566:

"The mere lack of a proportional representation has not been regarded as constitutionally deficient, and indeed, it has been held that an accused has no constitutional right to a jury composed of members, or having even a single member, of his or her class, race or sex. This principle was stated in *Fay v. New York* as follows:
·" 'It is fundamental in questioning the composition of a jury that a mere showing that a class was not represented in a particular jury is not enough; there must be a clear showing that its absence was caused by discrimination. . . .' " *Fay v. New York* (1947), 332 U. S. 261, 284, 67 Sup. Ct. 1613, 91 L. Ed. 2043.

The trial court properly denied the challenge to the jury array since there was no proof of a disproportionate representation of a unit of citizens on the jury array over a period of time and no proof of a systematic exclusion of Indians from jury panels in La Crosse county.

*Cross-examination.*

Desjarlais also complains of a limit upon the cross-examination of Mrs. LaFromboise, a key witness for the

state. Specifically, his counsel made a purported offer of proof that Mrs. LaFromboise had been on a week-long journey with the defendants prior to the incident (contrary to her direct examination that the trip to La Crosse from her home occurred on the day of the robbery), and that she had been taking unspecified drugs during this period. The obvious objective of the first proposed fact was to contradict the witness and thus inferentially attack credibility. *See: State v. Spraggin* (1976), 71 Wis. 2d 604, 622–625, 239 N. W. 2d 297. This line of attack foundered on the reiteration by the witness that the journey started at her home on the day of the robbery. No contradicting evidence was ever offered.

The second proposed subject of inquiry, use of drugs, has been held a permissible inquiry as the use of some substances may induce an impaired condition of mind and thus the use should be revealed to the jury for its determination of the accuracy of the user's accounts of the period. *Sturdevant v. State* (1970), 49 Wis. 2d 142, 181 N. W. 2d 523.

In an attempt to elicit further details on the proposed cross-examination by counsel, the trial court requested information on what drugs were involved and what testimony would be offered to show the effects of their use. Counsel described the drugs by the street term of "downers" and conceded he had no testimony on the effects of these drugs on the witness. The trial court concluded that drug use on the day of the robbery could be explored but ruled that the offer of proof was unsatisfactory as to earlier consumption. This ruling was consistent with *Sturdevant v. State, supra,* where the trial court rejected the defense attempt to prove a history of epilepsy without any offer to show how an epileptic condition affected credibility. Unspecified allegations of drug use are prejudicial and thus objectionable as the reference may impugn the character of the witness, such

as when usage is the licit consumption of prescribed medication.

In this case the trial court permitted the defense to inquire if Mrs. LaFromboise had taken any so-called "downers" on the day of the robbery. She stated that she did not. On redirect, the state elicited that she had been carrying prescribed medicine in her purse. The recross-examination produced the statement that the prescription was for Thorazine and Valium, sedating medicine. Objection was then properly made and sustained for an attempt to explore consumption of these drugs in earlier periods when there was an admission of intent not to show the effects of this use on the day in question. The defendant apparently was not concerned about drug effect when he permitted the witness to drive the getaway car.

Although this state follows the "wide open cross-examination rule," Judicial Council Committee's Note to sec. 906.10, Wis. Rules of Evidence, 59 Wis. 2d Rule 188, that theory deals only with the scope of cross-examination as not being bound by the subjects touched upon in direct examination. It does not permit the admission of prejudicial, irrelevant or other objectionable matters. The offer of proof here did not remove the proposed topic from the realm of objectionable evidence.

*Sentencing.*

In imposing sentence, the trial court had the benefit of a presentence investigation. The following statement, however, was made by the court before sentence was pronounced:

"Mr. Desjarlais, this record certainly does not lend itself to thinking that probation would be of any assistance. I am further satisfied that for the protection of the public, that you should be incarcerated and that I am satisfied that the offense for which you were tried in this case was one of which you were guilty. I have

a serious question in my mind whether the matter should have been tried, proof of guilt was so overwhelming."

The presentence investigation revealed that the defendant had committed offenses as a juvenile. In 1970 he was convicted of criminal damage to property in Minnesota and served a jail sentence. Later in 1970 he was convicted of burglary and sentenced to not more than five years in the state reformatory at St. Cloud, Minnesota. He was paroled in 1971 and within less than three months thereafter was arrested and convicted of burglary and theft. He was sentenced to five years in the Minnesota State Penitentiary at Stillwater on each count, the sentences to be served concurrently. The present offense of robbery was committed while he was on parole.

The court sentenced the defendant to the Wisconsin State Prison for an indeterminate term of not to exceed nine years and six months. It also indicated that it "may be served concurrently with any sentence resulting from violation of parole in the state of Minnesota."

Defendant's objection to the sentence is because it is near maximum (less time for pretrial incarceration) for robbery. This length is cited as an abuse of discretion because of the lack of articulated relevant factors or because of the use of improper factors.

A review of the presentence investigation report which was made a part of the record discloses that a rational basis for the sentence imposed may be inferred from the facts of defendant's background. In citing the "protection of the public," a pertinent sentencing consideration under *Embry v. State* (1970), 46 Wis. 2d 151, 157, 174 N. W. 2d 521, the trial court was obviously referring to the escalating seriousness of the crimes committed by Desjarlais, a pattern which was obviously undeterred by two prior brief terms in prison.

 We conclude from a review of the record that the trial court did not abuse its discretion in sentencing. The trial court's reference to the proof of guilt that was so "overwhelming" as to leave a question in his mind on why the charge was even tried was no indication that an improper factor weighed in the exercise of discretion. The trial court had the opportunity to review the sentence and his remarks by a subsequent motion, and it is quite obvious that the statement was made only to affirm that the actor's participation in the charged crime was clear.

*By the Court.*—Judgment and order affirmed.

† Motion for rehearing denied, without costs, on August 23, 1976.