C.D. BESADNY, Secretary Department of Natural Resources
You have asked whether state and county conservation wardens, while in fresh pursuit of a suspected offender, may legally enter the Menominee Indian Reservation and arrest a Menominee Indian suspect for an off-reservation violation of state law, whether the potential charges include a felony, a misdemeanor or a violation punishable only by a civil forfeiture. Implicit in your inquiry is the question of whether, and to what degree, the state's personal jurisdiction over a suspect thus arrested is dependent upon compliance with tribal procedures regulating the extradition of Indians from the Menominee reservation. I have received a similar inquiry from Shawano County District Attorney Gary Bruno concerning the authority of Shawano County sheriffs officers. Therefore my response will address the authority of both sheriff's officers and conservation wardens.
For the reasons which follow, I am of the opinion that state and county conservation wardens and sheriff's officers have authority under state law to arrest a Menominee Indian suspect on the reservation following a fresh pursuit for a violation of state law occurring off the reservation, if the arrest is one the officer is otherwise authorized to make. Although the state is generally obliged to comply with Menominee tribal extradition procedures, the state's personal jurisdiction over an Indian arrested under such circumstances is probably not pre-empted by federal law. Neither the failure of the tribal ordinance to address the fresh pursuit situation nor an officer's failure to comply with applicable tribal extradition requirements in a particular instance is likely to deprive the Wisconsin courts of personal jurisdiction over such a defendant.
A. The requirements of Wisconsin law must be met.
Before addressing the conflicting state and tribal jurisdictional issues central to your inquiry, it is important to note that the requirements of Wisconsin arrest law generally must be met because the legality of a warrantless arrest after a fresh pursuit may be critical to the state's personal jurisdiction over a defendant as a matter of state law. Cf. Walberg v. State,73 Wis.2d 448, 243 N.W.2d 190 (1976); State v. Monje,109 Wis.2d 138, *Page 247 325 N.W.2d 695 (1982), annotated at 25 A.L.R. 4th 157 (1983); United Statesv. Crews, 445 U.S. 463 (1980); 21 Am. Jur. 2d Criminal Law §§
340-41.
Thus, I assume that the officer in question has probable cause to make an arrest before initiating the pursuit, and that the offense to be charged is one for which the officer is authorized to make an arrest. City of Madison v. Ricky Two Crow, 88 Wis.2d 156,276 N.W.2d 359 (Ct.App. 1979); State v. Cheers,102 Wis.2d 367, 386-88, 306 N.W.2d 676 (1981). I further assume that both sheriff's officers and conservation wardens are "peace officers" or "law enforcement officers" as defined in the statutes. Secs.939.22 (22) and 967.02 (5), Stats.
If the officer has probable cause and the statutory authority to arrest without a warrant for the offense to be charged, it is irrelevant under section 175.40, Wisconsin's recently enacted statute on intrastate fresh pursuit, whether the alleged offense would be charged as a felony or misdemeanor or would simply be punishable by a civil forfeiture. Pursuant to section 175.40, any peace officer may, when in fresh pursuit, follow anywhere in the state and arrest any person for a violation of any law or ordinance the officer is authorized to enforce. Thus, Wisconsin has by statute abolished former territorial and subject matter limitations on a peace officer's authority to arrest after fresh pursuit within the state. Cf. Carson v. Pape, 15 Wis.2d 300,308, 112 N.W.2d 693 (1961). 5 Am. Jur. 2d Arrest § 51 (1962); Sec. 66.31, Stats. (1979); 61 Op. Att'y Gen. 419, 421 (1972).
The term "fresh pursuit,"[1] though not defined in section175.40, is a venerable common law concept which has typically been defined in the case law as pursuit without unreasonable delay under all of the surrounding circumstances. Six Feathers v.State, 611 P.2d 857, 861 (Wyo. 1980); see also State v. Tillman,208 Kan. 954, 494 P.2d 1178, 1182 (1972); Swain v. State,50 Md. App. 29, 435 A.2d 805, 810 (1981). Consistent with the case law, the Wisconsin *Page 248 
Uniform Act on Close Pursuit, which may be interpreted in parimateria with section 175.40, provides that close pursuit "shall not necessarily imply instant pursuit, but pursuit without unreasonable delay." Sec. 976.04 (5), Stats.
In the hypothetical situation you pose, the fresh pursuit would occur when a violation of state law is committed outside of the Menominee reservation and the pursuing officer follows the Indian suspect onto the reservation where the arrest occurs. The Menominee reservation, of course, is located within Menominee County and within the State of Wisconsin. Although exercise of a state's jurisdiction may be pre-empted or restricted by federal law because of a tribe's sovereign status, an Indian reservation itself is not extraterritorial to the state in which it is located. Cf. Organized Village of Kake v. Egan, 369 U.S. 60, 75
(1962). Therefore, assuming the arresting officer had probable cause and the statutory authority to arrest for the offense to be charged, an arrest after fresh pursuit onto the Menominee reservation is authorized under Wisconsin law. Cf. sec. 175.40, Stats.; State v. Barrett, 96 Wis.2d 174, 182, 291 N.W.2d 498
(1980). Moreover, the state's subject matter jurisdiction to try an Indian defendant for a violation of state law committed off the reservation is exclusive. Organized Village of Kake,369 U.S. at 75.
B. Pre-emption analysis summarized.
The central issue raised by your inquiry is whether the state's personal jurisdiction over a defendant arrested under the circumstances described is pre-empted by federal law and, in particular, whether the Menominee Tribe's efforts to control the extradition from the reservation of Indians charged with off-reservation crimes would oust the state of jurisdiction.
Aspects of this question were discussed in an earlier opinion, 70 Op. Att'y Gen. 36 (1981). In that opinion, which did not address the element of fresh pursuit, I concluded inter alia:
 [N]either the state nor Shawano/Menominee County officials have authority to enter the reservation to arrest tribe members or otherwise acquire personal jurisdiction over tribe members residing and located on the reservation in criminal matters occurring off the reservation.
70 Op. Att'y Gen. at 40. Cases decided since that opinion was written, along with the enactment of section 175.40, suggest that *Page 249 
the foregoing conclusion may require modification, at least in the fresh pursuit situation you pose.
Relatively few cases address a state's authority to arrest an Indian on the reservation for off-reservation violations of state law and the effect of tribal extradition procedures on the exercise of a state's jurisdiction to arrest and convict. Those cases are inconsistent if not directly conflicting, and there are no Supreme Court decisions which squarely address the issue. Cf.Davis v. Muellar, 643 F.2d 521 (8th Cir.), cert. denied 454 U.S. 892
(1981); Weddell v. Meierhenry, 636 F.2d 211 (8th Cir. 1980),cert. denied 451 U.S. 941 (1981); State of Arizona ex rel.Merrill v. Turtle, 413 F.2d 683 (9th Cir. 1969), cert. denied396 U.S. 1003 (1970); Benally v. Marcum, 89 N.M. 463, 553 P.2d 1270
(1976); State ex rel. Old Elk v. District Court of Big Horn,552 P.2d 1394 (Mont.), appeal dismissed 429 U.S. 1030 (1976); In theMatter of Little Light, 598 P.2d 572 (Mont. 1979); Fournier v.Roed, 161 N.W.2d 458 (N.D. 1968). See also F. Cohen, Handbook ofFederal Indian Law, 357-61, 382-84 (1982); Comment, The Right ofTribal Self-Government and Jurisdiction of Indian Affairs, 1970 Utah L. J. 291; Comment, Tribal Control of Extradition fromReservations, 10 Nat. Resources J. 626 (1970).
Furthermore, the reported cases often ignore extradition law generally, tending instead to either focus solely on the state's interest in securing jurisdiction over those who violate its laws or on the tribal interests in controlling the extradition of alleged offenders from within reservation borders. Finally, all of the reported cases in this area predate the most recent decisions of the Wisconsin and United States Supreme Courts which authoritatively restate the analytical framework to be applied in resolving state and tribal jurisdictional conflicts over Indians on the reservation. See Rice v. Rehner, 463 U.S. 713 (1983);State v. Webster, 114 Wis.2d 418, 338 N.W.2d 474 (1983); Countyof Vilas v. Chapman, 122 Wis.2d 211, 361 N.W.2d 699 (1985).
Rather than attempting to reconcile essentially irreconcilable cases, it seems more useful to attempt a fresh analysis of your questions based on Rice and Webster. Although both cases are factually distinguishable from the hypothetical situation you pose, the basic analytical framework used in each can be applied to the question of whether Menominee extradition procedures oust the state of personal jurisdiction over Indians arrested on the reservation for off-reservation offenses. SeeWebster, 114 Wis.2d at 433. A *Page 250 
careful reading of both Rice and Webster is, therefore, essential to an understanding of this opinion.
As noted in those cases, states are not absolutely barred from exercising jurisdiction over tribal reservations and members.Webster, 114 Wis.2d at 432, citing White Mountain Apache Tribev. Bracker, 448 U.S. 136, 141 (1980). There are, however, two related but independent barriers to the exercise of state jurisdiction — federal pre-emption and state infringement upon the right of tribal self-government. Id.
In Rice, the Supreme Court summarized the shift away from inherent Indian sovereignty toward reliance on federal pre-emption as a bar to state jurisdiction:
 The goal of any pre-emption inquiry is "to determine the congressional plan," . . . but tribal sovereignty may not be ignored and we do not necessarily apply "those standards of pre-emption that have emerged in other areas of the law." . . . We have instead employed a pre-emption analysis that is informed by historical notions of tribal sovereignty, rather than determined by them . . . . We do not necessarily require that Congress explicitly pre-empt assertion of state authority insofar as Indians on reservations are concerned, but we have recognized that "any applicable regulatory interest of the State must be given weight" and "`automatic exemptions "as a matter of constitutional law'" are unusual."
Rice, 463 U.S. at 718-19 (citations omitted).
C. The backdrop of tribal sovereignty.
The modern cases recognize that control over the extradition of Indians from the reservation is an aspect of tribal sovereignty or self-government. Turtle, 413 F.2d at 685-86; Davis,643 F.2d at 525 n. 8; Benally, 553 P.2d at 1271-72; cf. Old Elk,552 P.2d at 1397-98. See also Cohen, Handbook of Federal Indian Law at 382. This conclusion is consistent with constitutional extradition law generally, since extradition is essentially intersovereign in nature, creating only incidental rights in the accused. See Michigan v. Doran, 439 U.S. 282, 287 (1978); Tavarezv. U.S. Att'y Gen., 668 F.2d 805, 810 (5th Cir. 1982); State exrel. Niederer v. Cady, 72 Wis.2d 311, 317, 323-24,240 N.W.2d 626 (1976). Extradition provides an orderly process serving the dual function of securing for the asylum jurisdiction a means of protecting its residents from unjust criminal *Page 251 
actions by the demanding jurisdiction and of securing for the demanding jurisdiction the return of a fugitive for trial. Id.
Since extradition is an aspect of tribal sovereignty, therefore, the first question under Rice is whether the Menominee Tribe has a tradition of tribal self-government over extradition of Indians accused of off-reservation violations of state law. Rice, 463 U.S. at 720; Webster, 114 Wis.2d at 434; Chapman,122 Wis.2d at 215.
I am informed that in 1981, the Menominee Tribal Legislature adopted an ordinance governing extradition to the State of Wisconsin of Indians formally charged with felonies or with violating the terms of probation and parole under state law. In its statement of legislative policy, the ordinance sets forth the tribe's intent not to provide a haven for persons avoiding the enforcement of the state's criminal laws, but instead to provide a mechanism for state-tribal cooperation in returning to the demanding jurisdiction persons accused of violating the criminal laws of that jurisdiction.[2]
The existing tribal ordinance neither addresses nor provides any procedures for arrests by state law enforcement officers after a fresh pursuit onto the reservation, nor does it authorize the extradition of persons accused of misdemeanors or offenses punishable only by a civil forfeiture. However, it does appear that the Menominees have established a definite, if limited, policy of tribal self-government over the extradition of Indians charged with off-reservation felonies and probation and parole violations.
The second step in the Rice analysis requires an evaluation of the balance of state, federal and tribal interests involved.Rice, 463 U.S. at 720-25; Webster, 114 Wis.2d at 435; Chapman,122 Wis.2d at 216. The tribe's interests, as expressed in the tribal ordinance, are in creating orderly procedures under the supervision of tribal authorities, for the transfer of certain fugitives from state jurisdiction back to the state and in preventing tribal lands from becoming a haven for violators of state law.
The state's interest in apprehending and bringing to trial persons accused of violating state law is clear. Equally clear is the possible direct impact, beyond reservation boundaries, on effective state and *Page 252 
local law enforcement if the state has no mechanism for arresting Indians who violate state laws off the reservation and bringing them before the state courts for trial. Cf. Rice,463 U.S. at 724. This impact is particularly acute in the fresh pursuit situation where the identity of the suspect is often unknown to the pursuing officer so that alternative methods of apprehension, including the extradition process, are unavailable. Tribal concerns that the reservation not become a haven for fugitives are mirrored in those of state and local law enforcement that the reservation boundary not be a one-way barrier through which Indian lawbreakers can flee to avoid arrest. Disrespect for the law and the legal process is likely to be encouraged in both Indians and non-Indians if officers in fresh pursuit of a suspect cannot follow an Indian suspect onto the reservation to make an arrest.
The jurisdictional history of state, federal and tribal authority over the Menominee Reservation is exceedingly complex, and will not be repeated here. See generally, Webster,114 Wis.2d at 421-24, 436-37. Suffice it to say, as a result of the restoration of reservation status and retrocession of the state's jurisdiction, since March 1, 1976, the state has had no explicit authorization from Congress to exercise general jurisdiction over tribal members within the Menominee Reservation. Webster,114 Wis.2d at 437; cf. Sanapaw v. Smith, 113 Wis.2d 232,335 N.W.2d 425 (Ct.App. 1983). Although the state's jurisdiction over Indians on the Menominee Reservation is clearly limited, Rice,Webster and Chapman all caution that the lack of explicit federal authorization is not decisive, at least in matters where the state traditionally has exercised significant control or where there may be significant effects beyond the reservation boundaries. Rice, 463 U.S. at 731; Webster, 114 Wis.2d at 433-34;Chapman, 122 Wis.2d at 217-19. As noted above, the state has exclusive jurisdiction over off-reservation violations of state law and this is an area where the impact on state and local law enforcement could be direct and significant.
It may also be relevant that the state continues to have general jurisdiction over non-Indians on the reservation. The state, for example, has jurisdiction over crimes committed on the reservation by non-Indians against non-Indians. United States v.Wheeler, 435 U.S. 313, 324-25, n. 21, citing United States v.McBratney, 104 U.S. 621 (1882). *Page 253 
Article IV, section 2 of the Federal Constitution, which governs extradition between states, does not apply to state-tribal extradition. Cf. Ex Parte Morgan, 20 F. 298 (W D. Ark. 1883); Turtle, 413 F.2d at 685. Nonetheless, it is notable that as between the states, Wisconsin's right to secure the extradition of fugitives from its jurisdiction has constitutional protection. Furthermore, the traditional rule is that a state maintains its personal jurisdiction to try a defendant even if the defendant has been removed from an asylum jurisdiction in violation of the asylum state's or nation's extradition laws.Frisbie v. Collins, 342 U.S. 519, 522 (1952); Mahon v. Justice,127 U.S. 700 (1888); Davis, 643 F.2d at 526; Weddell,636 F.2d at 214-15; Desjarais v. State, 73 Wis.2d 480, 489-90,243 N.W.2d 453 (1976); Baker v. State, 88 Wis. 140, 59 N.W. 570 (1894); cf.State v. Monje, 109 Wis.2d 138, 325 N.W.2d 695 (1982); State v.Brown, 118 Wis.2d 377, 348 N.W.2d 593 (Ct.App. 1984).
On the other hand, in the interest of state and tribal comity, Wisconsin has a strong interest in cooperating with tribal law enforcement generally and in complying with tribal extradition requirements specifically. This interest has received express legislative recognition in the enactment of section 976.07, which clearly contemplates mutual assistance and cooperation in extradition matters.
The final component to be added to the balance is the nature of the federal interests involved. In general, there would appear to be a strong federal interest in promoting observance of extradition procedures between the state and the tribe, if only because the extradition clause of the Constitution has significant implications for federalism and national unity:
 The purpose of the Clause was to preclude any state from becoming a sanctuary for fugitives from justice of another state and thus "balkanize" the administration of criminal justice among the several states. It articulated, in mandatory language, the concepts of comity and full faith and credit . . . .
Doran, 439 U.S. at 287-88. Certainly, the same policy considerations would apply to the state-tribal extradition context. At the same time, the federal government has no identifiable interest in obstructing a state's authority to bring before its courts those who violate its laws, so long as basic constitutional guarantees, such as due process, are observed. *Page 254 
Having determined that there is a limited tradition or policy of tribal sovereignty with regard to extradition of accused felons and probation and parole violators, and having identified the various state tribal and federal interests involved, it is necessary to evaluate the balance of those interests in order to determine the "backdrop of tribal sovereignty" which must precede the pre-emption analysis in the situation you describe. Rice,463 U.S. at 720-25; Webster, 114 Wis.2d at 435-36.
Rice explicitly declares that there is no single notion of tribal sovereignty. Rice, 463 U.S. at 725. Based on Rice andWebster, the balance which the courts may strike in any particular instance cannot be predicted with certainty. Cf.Chapman, 122 Wis.2d at 216-17. Both cases do, however, suggest a number of factors which may influence the balance in a particular case. Whether a tradition of tribal sovereignty exists and whether the subject matter has a substantial impact beyond the reservation are clearly important. Rice, 463 U.S. at 725. Both factors are present in the fresh pursuit situation you describe.
In addition, it seems particularly appropriate in such a jurisdictionally interrelated area as arrest and extradition to inquire whether an accommodation of state tribal and federal interests is possible. Cf. Washington v. Confederated Tribes ofthe Colville Reservation, 447 U.S. 134, 156 (1980). Although the state, tribal and federal interests involved are significant, analysis suggests that they are not necessarily in conflict. It would appear, in fact, that an accommodation of state and tribal interests is possible to a great degree. The tribe has disavowed any interest in providing a sanctuary for fugitives from state jurisdiction and has sought primarily to establish a fair and orderly process for the apprehension of accused felons and probation and parole violators and their transfer to state custody. The state, of course, is primarily concerned about securing custody of fugitives by lawful means in order to bring them to trial, and has a strong interest in having the cooperation of tribal authorities in doing so.
In the situation where a state felony arrest warrant or a probation and parole hold has been issued or can be secured, state and tribal interests can be accommodated by compliance with existing tribal extradition procedures. Indeed following Chapman, the tribal extradition ordinance would appear to control.Chapman, 122 Wis.2d at 216-17. *Page 255 
Arguably at least, state and tribal interests can also be reconciled in the fresh pursuit situation, even though the tribal extradition ordinance does not address fresh pursuit or provide a mechanism to process arrests after a fresh pursuit by state or local law enforcement officers. Both legal precedent and practical concerns suggest that the failure of the tribal ordinance to address the fresh pursuit situation would not itself preclude a lawful arrest or pre-empt the state's jurisdiction. On the other hand, Chapman suggests that tribal legislation on the issue of fresh pursuit, if enacted, would be controlling.Chapman, 122 Wis.2d at 211.
As noted earlier in this opinion, the doctrine of fresh pursuit is a venerable and universally recognized exception to intrastate limitations on the authority to arrest across jurisdictional lines. It has apparently been recognized in the reservation context as well. See Cohen, Handbook of FederalIndian Law at 357 n. 80. In addition, the distinction between a warrantless arrest in advance of extradition based solely on probable cause and the institution of formal extradition proceedings based on an extradition warrant or requisition has long been recognized. Burton v. New York C. H. RR. Co.,245 U.S. 315, 318 (1917); State v. Klein, 25 Wis.2d 394, 402-03,130 N.W.2d 816 (1964). According to Burton, the federal constitutional provisions and statutes regulating extradition do not apply to an arrest prior to an extradition request, nor do they immunize a citizen from arrest until after extradition proceedings have been initiated. Burton, 245 U.S. at 318-19. By analogy, it seems unlikely that the failure of the tribal extradition ordinance to address the issue of arrests after fresh pursuit can by itself immunize tribe members from such an arrest or pre-empt a state officer's otherwise lawful authority to make such an arrest. Cf Chapman, 122 Wis.2d at 216-17.
As a practical matter, of course, in any fresh pursuit situation established policy should require that the state or local law enforcement officer involved contact tribal police at the earliest opportunity to inform tribal authorities of the entry into tribal jurisdiction and, if possible, to secure their assistance. If the fresh pursuit problem is a recurring one, it may be appropriate to explore the possibility of establishing a formal procedure for handling such arrests, possibly in the context of an agreement contemplated by section 976.07. A workable solution to tribal-state fresh pursuit issues is, of course, a goal to be pursued. *Page 256 
In summary, although there is a limited tradition of tribal sovereignty over certain extradition matters, the balance of state, federal and tribal interests involved appears to favor an accommodation of the competing sovereign interests, rather than ignoring one in favor of the others. Cf. Rice, 463 U.S. at 719,724.
D. Pre-emption.
With this backdrop of tribal sovereignty in mind, the final question under Rice is whether the state's jurisdiction is pre-empted by federal law. 463 U.S. at 725.
Pre-emption may result either from specific treaty provisions or from pervasive federal regulation in a defined area which excludes state intervention. Webster v. Department of Revenue,102 Wis.2d 332, 333-34 nn. 3 and 4, 306 N.W.2d 701 (Ct.App. 1981). Or, as repeatedly described in Rice and earlier cases, the question is whether the state's action would "impair a right granted or reserved by federal law." 463 U.S. at 726.
The various treaties with the Menominee contain no express provisions relating to extradition or criminal law generally. See
C. Kappler, Indian Treaties, 1778-1883 (1904 ed., reprinted 1972), and the successive treaties with the Menominee Tribe reprinted therein.
I am unaware of any federal statutes directly regulating either on-reservation arrests after fresh pursuit or state-tribal extradition problems generally. The Secretary of Interior has, however, promulgated a federal regulation under his general rule-making authority giving the Minneapolis Director of the Bureau of Indian Affairs (BIA) discretion to control the extradition of individual Indians from the Menominee Reservation. 25 C.F.R. § 11.95ME (1985). The BIA area director is authorized to order the arrest by tribal police of particular Indian fugitives accused of crimes off the reservation and the delivery of those persons to state authorities at the boundaries of the reservation. 25 C.F.R. § 11.95ME(a). Alternatively, the person arrested may demand a hearing before a tribal judge regarding the existence of probable cause and the likelihood of a fair trial in the demanding jurisdiction. 25 C.F.R. § 11.95ME(b); but see Doran, 439 U.S. at 290.
The federal regulation essentially gives the BIA area director discretion to secure the apprehension of a particular fugitive when tribal authorities cannot or will not act. Like the tribal ordinance, the regulation does not address the question of fresh pursuit by *Page 257 
state or local law enforcement officers onto the reservation. The federal regulation does appear to assume that state or local authorities themselves cannot go onto the reservation directly and make an arrest. In general, I do not disagree with that conclusion. See 70 Op. Att'y Gen. 36, 38-40 (1981).
It seems doubtful, however, that lack of state authority would be presumed in the fresh pursuit situation you describe involving an off-reservation offense over which the state unquestionably has exclusive jurisdiction. Cf. Rice, 463 U.S. at 726-33. Assuming this to be the case, the only remaining question is whether upholding the state's authority to make such arrests would "impair a right granted or reserved by federal law." Id. at 726.
In answering that question, it is important to bear in mind whose rights are at issue. Traditionally, extradition is a right of the sovereign, in this case the state and the Menominee Tribe.Cf. Niederer, 72 Wis.2d at 324. By analogy with federal cases concerning the scope of extradition, the failure of the tribal ordinance or federal regulation to address the fresh pursuit situation would not by itself pre-empt a state officer's otherwise lawful authority to make such an arrest. Burton,245 U.S. at 315; cf. Chapman, 122 Wis.2d at 217-18.
There is, however, one case which does recognize tribal sovereignty as a bar to a state's jurisdiction in a fresh pursuit situation. Benally, 553 P.2d at 1270. Benally is partially distinguishable because the New Mexico fresh pursuit statute was limited to felony arrests and did not apply in that particular case. More importantly, the reasoning of the Benally decision is inconsistent with more recent cases like White Mountain ApacheTribe v. Bracker, 448 U.S. 136 (1980), and Rice which require a balancing of interests and that any applicable interest of the state be given weight. Rice, 463 U.S. at 720.
Contrary to the result in Benally, there is no persuasive evidence of congressional intent to make individual Indians who flee to the reservation to escape imminent arrest exceptions to the fresh pursuit doctrine or immune from ordinary state arrest authority. Cf. Rice, 463 U.S. at 733-34. My primary conclusion, therefore, based on Rice and Webster, is that an arrest after fresh pursuit under the circumstances you have described does not impair Menominee tribal sovereignty over extradition matters and is not pre-empted by *Page 258 
federal law. See also Fournier, 161 N.W.2d at 458; Old Elk,552 P.2d at 1394; Little Light, 598 P.2d at 572; but see Benally,553 P.2d at 1270; Turtle, 413 F.2d at 683.
Even if one assumes that some aspect of Menominee tribal sovereignty is at least minimally impaired by a state officer's on-reservation arrest following a fresh pursuit, cf. Davis,643 F.2d at 525 n. 8, it is doubtful that the state is thereby deprived of personal jurisdiction over a defendant thus arrested.Id. at 527. The general rule, cited above, is that failure to observe established extradition procedures does not deprive a state of personal jurisdiction over a defendant. Frisbie,342 U.S. at 522; Weddell, 636 F.2d at 214-15; Desjarlais,73 Wis.2d at 489-90.
If the failure to comply with constitutional and statutory extradition requirements does not deprive a demanding state of jurisdiction, it is difficult to conclude that a state's failure to follow tribal extradition procedures would do so. As the Eighth Circuit has observed, in dicta:
 [W]e are unable to find that the United States has by policy, by treaty by statute or by court decision decreed [the state's] loss of personal jurisdiction over [the defendant] as a penalty for having arrested [him] in violation of the tribal extradition ordinance here involved.
Davis, 643 F.2d at 527.
In conclusion, although the state is obliged generally to comply with Menominee tribal extradition procedures, I conclude that an arrest after fresh pursuit under the circumstances described does not impair tribal sovereignty and is not pre-empted by federal law. Even if an arrest in a particular case is made in violation of tribal extradition procedure, federal extradition law clearly suggests that the state is not thereby deprived of personal jurisdiction over the defendant. Nonetheless, in light of Chapman, 122 Wis.2d at 211, tribal legislation on the hot pursuit issue would generally be controlling. For this and other reasons, this office will continue its efforts to work with the tribe to reach a mutually acceptable resolution of tribal-state fresh pursuit problems.
BCL:MAM
[1] Although the terms "fresh pursuit" and "hot pursuit" are sometimes used interchangeably. "hot pursuit" is more frequently used as an example of an "exigent circumstance" which obviates the need to obtain a search or arrest warrant when an arrest is made within a private dwelling. See Welsh v. Wisconsin,104 S.Ct. 2091 (1984), rev'g State v. Welsh, 108 Wis.2d 319, 336,321 N.W.2d 245 (1982); Steagald v. United States, 451 U.S. 204, 221
(1981); United States v. Santana, 427 U.S. 38, 42-43 n. 3 (1976). While the element of a chase is, of course common to both concepts, the term "fresh pursuit" is more frequently applied when the chase occurs across jurisdictional boundaries.
[2] Section 976.07, Stats., enacted in 1982, authorizes the state to enter into an agreement for an essentially complementary arrangement for the extradition to the tribe or witnesses fugitives and evidence. No formal agreement under section 976.07
has yet been reached.
 *Page 1